TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00217-CV






Trinity Industries, Inc., Appellant



v.



Ashland, Inc. and ATEC, Inc., Appellees






FROM THE DISTRICT COURT OF DALLAS COUNTY, 160TH JUDICIAL DISTRICT


NO. 96-12960, HONORABLE DAVID C. GODBEY, JUDGE PRESIDING 






 Trinity Industries, Inc. ("Trinity") sued Ashland, Inc. and ATEC, Inc. (collectively
"Ashland") (1) for damages arising out of Ashland's sale of its subsidiary, Beaird Industries, Inc.
("Beaird"), to Trinity. (2) Ashland asserted third-party claims against Beaird. A jury found against
Trinity on its claims against Ashland and against Ashland on its claims against Beaird, and the trial
court rendered judgment, which Trinity now appeals. We will affirm the judgment. 


BACKGROUND

 On January 12, 1990, Trinity entered into a Purchase and Sale Agreement (the
"Agreement") with Ashland whereby Trinity would purchase all of the outstanding stock of Beaird. 
Beaird's industrial plant is located in Shreveport, Louisiana, where it manufactures steel vessels and
other equipment. The Agreement required Ashland to perform an environmental audit on the Beaird
facility. Ashland retained the environmental engineering firm of Dames & Moore to assess
environmental conditions at the Beaird facility. Dames & Moore prepared a preliminary
environmental assessment, dated January 22, 1990. The final version, entitled "Environmental
Assessment," was completed on February 8, 1990. In its environmental assessment, Dames &
Moore identified two areas of possible environmental contamination on the property: a storm-water
ditch and a soil-stained area. Trinity responded to the February 8 environmental assessment by
sending Ashland a letter detailing twenty items that Trinity wished resolved before it would complete
the Beaird purchase. 

 Dames & Moore then conducted a second environmental assessment to more
specifically define the areas of environmental concern identified in the February 8 environmental
assessment. Dames & Moore completed its second assessment, entitled "Phase II Environmental
Assessment Final Report" ("Phase II Assessment"), on April 6, 1990. The Phase II Assessment
identified a soil-stained area near Beaird's maintenance building and the presence of trichloroethene
("TCE") in the groundwater under the Beaird facility; the contamination was estimated "to be limited
to a 400-foot diameter area . . . at a depth of 42 feet." The Phase II Assessment also proposed a
remediation plan and remedial cost estimates for the contaminated groundwater and stained soil of
$81,000 to $102,000. Ashland relied on Dames & Moore's environmental assessments in making
representations to Trinity in connection with the sale.

 After Dames & Moore prepared the Phase II Assessment, Ashland and Trinity entered
into the Second Amendment to the Purchase and Sale Agreement (the "Second Amendment"). The
Second Amendment defined the area of soil staining and groundwater contamination described in
the Phase II Assessment as the "Identified Contamination." The Second Amendment also addressed
the cleanup of the Identified Contamination, referred to as the "Identified Contamination
Remediation," by defining Ashland's obligations to clean up the property. This appeal principally
concerns section 3.12(m) of the Second Amendment relating to Ashland's obligations to pay for
cleanup of the Identified Contamination. 

 Before closing the sale, Ashland obtained a certificate signed by William Adams, then
president of Beaird, dated April 23, 1990. Ashland had obtained a similar certificate from Adams
dated February 12, 1990. In the February 12 and April 23 certificates (the "Adams certificates"),
Adams certified that "to the best of [his] knowledge and belief, all of the representations and
warranties of ATEC, Inc. and Ashland Oil, Inc. ("Ashland") in the Purchase and Sale Agreement
among ATEC, Ashland, and Trinity Industries, Inc. dated January 12, 1990, are materially true and
correct."

 The sale of Beaird to Trinity closed on April 23, 1990. After closing, Ashland hired
Dames & Moore to perform the Identified Contamination Remediation. On February 11, 1991,
Dames & Moore compiled a status report on the soil and ground water remediation at the Beaird
property. The report stated that Dames & Moore had not encountered a confining layer of soil as it
had expected and that the contaminants had increased in certain wells. In October 1991, the
Louisiana Department of Environmental Quality conducted an investigation at the Beaird facility
based on a complaint it received that paint and other waste had been buried on the property. 

 In 1996 after spending $500,000 on cleanup operations at Beaird, Ashland turned over
remediation of the site to Trinity. Ashland's decision to cease cleanup operations was apparently
based on its interpretation of a provision in the Agreement that purported to limit Ashland's
obligations to $500,000. As Beaird's new parent company, Trinity began to oversee the cleanup. 
Trinity thereafter filed suit against Ashland for breach of the Agreement and fraud. The case was
tried before a jury, which found in favor of Ashland on Trinity's claims against Ashland and in favor
of Beaird on Ashland's claims against Beaird. Specifically, the jury found that Ashland's total
obligation to pay for cleanup of the property would under no circumstances exceed $500,000. The
jury failed to find Ashland liable for breach of contract, fraud, or statutory fraud. The trial court
consequently rendered judgment against Trinity on its claims against Ashland, and against Ashland
on its claims against Beaird. Trinity now appeals the trial court's judgment.


DISCUSSIONSubmission of Jury Instruction

 By its first two issues on appeal, Trinity argues that submission of the first jury
question and accompanying instruction constituted harmful error. Alternatively, Trinity argues that
even if question number one was properly submitted, there was insufficient evidence to support the
jury's affirmative answer. The first jury question asked the following: "Did Ashland and Trinity
agree that Ashland's total obligation to pay for cleanup of the property would under no
circumstances exceed $500,000?" The trial court, apparently determining that the Agreement at
issue was ambiguous, instructed the jury as follows with respect to section 3.12(m): 


It is your duty to interpret the following language of the second amendment:


[3.12(m)] 

Notwithstanding any other provision of this Agreement to the contrary, the
obligations of Ashland and ATEC described in Sections 3.12(e) and
5.2(a)(10) shall be limited to a maximum amount of Five Hundred Thousand
Dollars ($500,000).

You must decide its meaning by determining the intent of the parties at the time of
the agreement. Consider all the facts and circumstances surrounding the making of
the agreement, the interpretation placed on the agreement by the parties, and the
conduct of the parties.



The jury answered the question in the affirmative. 

 Trinity objected at trial that, because section 3.12(m) is unambiguous as a matter of
law, its construction was a question of law for the court, not of fact for the jury. The trial court
overruled Trinity's objection and submitted the matter to the jury. 

 A trial court has broad discretion in determining the proper issues and instructions
to be submitted to the jury, and this Court will not disturb the trial court's determinations absent an
abuse of discretion. Lindgren v. Delta Invs., 936 S.W.2d 422, 426 (Tex. App.--Austin 1996, writ
denied). The meaning of a contract should be submitted to the jury as a fact question only if the
contract is ambiguous. Coker v. Coker, 650 S.W.2d 391, 393-94 (Tex. 1983). If the contract is
unambiguous, the court must enforce the contract as written. Lopez v. Munoz, Hockema & Reed,
L.L.P., 22 S.W.3d 857, 862 (Tex. 2000). 

 Whether a contract is ambiguous is a question of law that must be decided by
examining the contract as a whole in light of the circumstances present when the parties entered into
the contract. Columbia Gas Transmission Corp. v. New Ulm Gas, 940 S.W.2d 587, 589 (Tex. 1996);
National Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d 517, 520 (Tex. 1995); Coker, 650 S.W.2d
at 394. If the contract is subject to two or more reasonable interpretations after applying the relevant
rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent. 
Columbia Gas, 940 S.W.2d at 589. A contract is not ambiguous, however, if it is so worded that it
can be given a certain or definite legal meaning or interpretation. Universal C. I. T. Credit Corp. v.
Daniel, 243 S.W.2d 154, 157 (Tex. 1951). An ambiguity does not arise simply because the parties
advance conflicting interpretations of the contract. Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132,
134 (Tex. 1994). 

 In determining whether section 3.12(m) is ambiguous, we must view that section in
its entirety, including the other sections referred to within section 3.12(m), which describe "the
obligations of Ashland." The obligations of Ashland described in section 3.12(e) refer to the
Identified Contamination Remediation. That section states, "All Environmental Costs or other costs
and expenses of such Identified Contamination Remediation shall be paid by ATEC and Ashland
. . . without limitation." Ashland's obligations described in section 5.2(a)(10) are to 


indemnify and hold harmless Beaird and [Trinity] . . . against any loss, liability,
claim, damage, costs or expense (including, without limitation, . . . all Environmental
Costs and all costs of any required or necessary . . . clean-up or detoxification of any
Subject Property . . . remedial or other plans required by an Environmental Agency
. . .) resulting from any such untrue statement, omission or breach of warranty. 



 Thus, when analyzing section 3.12(m) and relevant provisions in their entirety, an
ambiguity arises over the extent of Ashland's obligations to clean up the Beaird property and
indemnify Trinity for costs relating to such cleanup. Under sections 3.12(e) and 5.2(a)(10), Ashland
is obligated to pay all environmental costs for cleanup, "without limitation." Under section 3.12(m),
on the other hand, Ashland's obligations are "limited to a maximum amount of Five Hundred
Thousand Dollars." 

 Testimony in the record indicates that the limitation was a crucial element in the
closing of the Beaird sale; we consider this when examining the contract as a whole in light of the
circumstances present when the Agreement was entered. We cannot say that one certain or definite
legal meaning prevails. Instead, we are faced with at least two somewhat contradictory meanings
that arise from section 3.12(m) and its accompanying provisions: either Ashland is strictly limited
in its cleanup obligations to $500,000, or, as Trinity's lawyers urged at trial, if Ashland had made
untrue statements or representations, it would be liable "without limitation" regardless of the
limitation in 3.12(m). Because it is uncertain as to which meaning is the proper one, this section of
the Agreement is ambiguous, see Universal C. I. T. Credit Corp., 243 S.W.2d at 157, and the trial
court therefore did not err in submitting the issue of its interpretation to the jury. (3) 

 Even in the event the trial court did err in submitting the interpretation of section
3.12(m) to the jury, however, we disagree that the harm of which Trinity complains could result from
its submission. Trinity contends that the error injected by permitting the jury to "draft the agreement
for the parties" led to harmful, adverse findings throughout the charge. Specifically, Trinity contends
that "the jury predicated its finding in Question No. 2-that Ashland did not fail to comply with the
Agreement-on its finding that the interpretation of section 3.12(m) urged by Ashland was correct." 
We note that Trinity complained to the trial court only that section 3.12(m) was unambiguous and
should therefore not be submitted; it did not urge to the trial court, as it does before this Court, that
its submission would lead to additional adverse findings. We nevertheless address Trinity's 
argument.

 Trinity relies on GTE Mobilnet of South Texas Ltd. Partnership v. Telecell Cellular,
Inc., 955 S.W.2d 286 (Tex. App.--Houston [1st Dist.] 1997, writ denied), to argue that submission
of the instruction accompanying question number one "tainted the entire verdict" and that once the
jury answered question number one, the answer to question number two was "preordained." In GTE
Mobilnet, the trial court declared a paragraph from the parties' agency agreement ambiguous and
submitted the issue of its interpretation to the jury. Id. at 289. On appeal, Mobilnet argued that the
court erred by finding the paragraph ambiguous. Id. The court of appeals agreed with Mobilnet that
the paragraph was unambiguous and found the trial court to be in error. Id. at 289, 290. The
appellate court further held that the error was harmful, stating that it could not say "that the judge's
error was harmless, because the jury predicated its finding that Mobilnet breached the contract on
its finding that the interpretation urged by the appellees was correct." Id. at 290. 

 Here, however, there is no evidence that the jury predicated its answer to question
number two, in which it failed to find that Ashland breached the Agreement, on its answer to the first
jury question. Trinity points to no evidence supporting its assumption that the jury predicated its
"no" answer to question number two on its "yes" answer to question number one. Question two
inquired whether Ashland failed to comply with the Agreement. The court instructed the jury that
Ashland failed to comply with the Agreement if, on the closing date, Ashland made untrue
representations dealing with (1) the cost of cleanup, (2) the extent of hazardous materials at the
Beaird site, (3) Beaird's compliance with applicable laws, and (4) Beaird's possession of all legally
required permits. None of these factors flow from the parties' intent or agreement concerning the
extent of Ashland's obligation to pay for cleanup. 

 Nowhere in the instruction to the second jury question was the jury instructed to take
into account the substance of question number one in determining whether Ashland complied with
the Agreement. Furthermore, question number two was submitted without any predicating
instruction. In sum, we cannot say that the issue of an agreement limiting the cost of cleanup in
question number one influenced the jury's answer regarding liability for breach of contract in
question number two. We accordingly cannot conclude that any error complained of probably
caused the rendition of an improper judgment or probably prevented Trinity from properly presenting
the case to this Court. See Tex. R. App. P. 44.1. We overrule Trinity's first issue. 


Sufficiency of the Evidence 

 By its second issue, Trinity argues that, even if the submission of question number
one did not constitute harmful error, there was insufficient evidence to support the jury's answer that
Ashland and Trinity agreed that Ashland's total obligation to pay for cleanup of the property would
under no circumstances exceed $500,000.

 In determining whether the evidence legally supports the verdict, we consider only
the evidence and inferences tending to support the jury's finding and disregard all evidence and
inferences to the contrary. Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995). We
will uphold the jury's finding if it is supported by more than a scintilla of evidence, that is, when the
evidence supporting the finding rises to a level that would enable reasonable and fair-minded people
to differ in their conclusions. Id. 

 At trial, Ashland's witness John Brothers testified that, regarding the contamination,
"Ashland would not be responsible to spend more than half a million dollars for the clean-up ever
. . . that was the substance of this amendment number two." (Emphasis added.) He further agreed
that the consensus was "to limit Ashland's responsibility for clean-up period to $500,000." William
Miller, an attorney for Ashland, testified that the "whole purpose" of what the parties were agreeing
to was that the "cap provision" in 3.12(m) controlled "with regard to . . . [Ashland's] obligations,
and any liability that Ashland could ever have in connection with those obligations under any
provision of the agreement." Regarding the language in section 3.12(m) that states,
"Notwithstanding any other provision of this Agreement to the contrary," Brothers testified that the
meaning of this language was that "if some other provision of this . . . agreement . . . were intended
to give Trinity relief, so to speak . . . this paragraph would rule." Williams similarly testified that
"what it means is that this provision controls with regard to these obligations, and any liability that
Ashland could ever have in connection with those obligations under any provision of the agreement." 

 While such testimonial evidence of the intent of the parties could not show whether
the contract provision was ambiguous, see Friendswood Development Co. v. McDade + Co., 926
S.W.2d 280, 283 (Tex. 1996), such evidence can be considered in ascertaining the true intentions
of the parties expressed in the contract. The testimony of Ashland's witnesses enables reasonable
and fair-minded people to differ in their conclusions about the parties' agreement set out in section
3.12(m); as such, it constitutes more than a scintilla of evidence. See Burroughs Wellcome Co., 907
S.W.2d at 499. 

 When reviewing a jury verdict to determine the factual sufficiency of the evidence,
we must consider and weigh all the evidence and should set aside the judgment only if the evidence
is so weak or so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.
1965). In reviewing all the disputed evidence, we bear in mind that the jury is the sole judge of the
credibility of witnesses and is entitled to accept or reject any testimony it wishes, as well as to decide
what weight to give the testimony. Simons v. City of Austin, 921 S.W.2d 524, 531 (Tex.
App.--Austin 1996, writ denied). The case turned on which witnesses the jury believed. The jury
apparently found Ashland's witnesses more credible than Trinity's witnesses or gave their testimony
more weight. After reviewing all of the evidence presented by both sides concerning Ashland's
obligations to pay for cleanup of the subject property, we cannot say that the jury's finding is
supported by evidence so weak as to make the verdict clearly wrong and unjust. We cannot
substitute our judgment when a jury verdict is grounded in sufficient evidence, Cain, 709 S.W.2d
at 176, and we will not substitute our judgment for that of the trier of fact merely because we might
reach a different conclusion. Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190,
196 (Tex. App.--Austin 1992, no writ). We thus overrule Trinity's second issue. 



Immaterial Jury Finding

 By its third and fourth issues, Trinity argues that the jury's answer to question number
three is immaterial and not supported by legally or factually sufficient evidence. In response to
question number two, the jury failed to find that Ashland breached the Agreement. The jury then
answered "yes" to question number three, which asked, "Was Ashland's failure to comply with the
Agreement, if any, excused?" 

 When jury questions are conditioned upon an affirmative answer to a prior question,
a negative answer to the preceding question renders all subsequent findings either improper,
immaterial, or devoid of legal significance. American Recreational Mkts. Gen. Agency, Inc. v.
Hawkins, 846 S.W.2d 476, 478 (Tex. App.--Houston [14th Dist.] 1993, no writ). A typical
conditionally submitted question asks the jury if its answer to a previous question is "yes"; if so, the
instruction directs the jury to answer the conditionally submitted question. Otherwise, the jury is
typically instructed not to answer the conditionally submitted question. Here, question number three
had no such conditional language. Instead, the question as posed gave the jury the option to find
that, if it failed to comply, Ashland was excused from a failure to comply with the Agreement
without regard to the jury's answer to the previous question. However, because whether Ashland
was excused from any failure to comply with the Agreement is not necessary to our disposition of
the appeal, we need not address this issue. See Tex. R. App. P. 47.1. We overrule Trinity's third
and fourth issues.



Motion for Judgment Notwithstanding the Verdict

 Texas Rule of Civil Procedure 301 provides that a court may render judgment non
obstante veredicto ("JNOV") if a directed verdict would have been proper and may disregard any
jury finding on a question that has no support in the evidence. Tex. R. Civ. P. 301. By its fifth issue, 

Trinity argues that the trial court erred by failing to grant Trinity's motion for JNOV as to Ashland's
liability for breach of contract and fraud because Trinity conclusively proved that Ashland was liable. 

 A motion for JNOV should be granted when the evidence is conclusive and one party
is entitled to judgment as a matter of law. Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227-28
(Tex. 1990). We review the denial of a motion for JNOV under a legal sufficiency or no evidence
standard of review. Kahlig v. Boyd, 980 S.W.2d 685, 688 (Tex. App.--San Antonio 1998, pet.
denied). That is, we review the evidence in the light most favorable to the jury findings, considering
only the evidence and inferences that support them and disregarding all evidence and inferences to
the contrary. Navarette v. Temple Indep. Sch. Dist., 706 S.W.2d 308, 309 (Tex. 1986). If there is
more than a scintilla of evidence to support the findings, the motion for JNOV was properly denied. 
Mancorp, 802 S.W.2d at 228. We will affirm the jury's verdict if there is any evidence of probative
value to support it. International Armament Corp. v. King, 686 S.W.2d 595, 597 (Tex. 1985). Only
if there is no evidence to support the jury's findings must we examine the entire record to see if the
contrary position is established as a matter of law. Sterner v. Marathon Oil Co., 767 S.W.2d 686,
690 (Tex. 1989).

I. Breach of Contract Claims

 Trinity argues that Ashland breached its representations in the Agreement regarding
hazardous materials, environmental costs, ownership of necessary licenses and permits, and
compliance with applicable laws. The only question concerning Ashland's failure to comply with
the Agreement was the second jury question. The court instructed the jury that Ashland failed to
comply with the Agreement if the following representations were not true on the closing date:
representations dealing with the extent of hazardous materials at the Beaird site, the cost of cleanup, 
Beaird's compliance with applicable laws, and Beaird's possession of all legally required permits. 


 A. Hazardous Materials

 Ashland represented in the Agreement that, except the contamination described in the
area of the Identified Contamination, "[n]o hazardous materials . . . shall be located on, at, or under
the Subject Property on the Closing Date in a manner or in a quantity that is in violation of
Governmental Requirements." The Identified Contamination, detailed in the Phase II Assessment
prepared by Dames & Moore, described TCE contamination within a "400-foot diameter area
northwest of the maintenance building . . . present at detectable concentrations to the top of the first
confining layer at a depth of 42 feet." Trinity contends that Ashland breached the Agreement
because the groundwater contamination at Beaird was more extensive than the 400-by-42-foot
estimate Ashland disclosed and because Ashland never disclosed the existence of "the Paint Pit,"
a pit near a sandblasting building on the Beaird property in which paint and related wastes had been
buried. 

 Reviewing the evidence in the light most favorable to the jury findings, we consider
the following evidence: Susan Litherland, an environmental engineer who was asked to review the
Phase II Assessment and who was called as an expert witness for Ashland, testified that Dames &
Moore's 1990 description of the horizontal and vertical extent of contamination, relied on by
Ashland in making the representation concerning the extent of contamination, reasonably and
accurately represented the data available at the time. Litherland testified as follows:


I believe that the representations by Dames & Moore back in '90 were reasonable. 
They described a site of approximately 400 feet, a circular area, 400 feet in diameter
and about 42 feet in depth, with a concentration of about a thousand parts per billion
of TCE. And based on my review, there was no data available at that time and no
data available today that says that was erroneous. 



(Emphasis added.)

 Schuyler Theis Rice, who had worked as an environmental consultant, environmental
director, and counsel for Trinity, conceded during cross examination that he had previously testified
that he did not know of any information available in 1990 that would indicate that Dames & Moore's
Phase II Assessment, dated April 6, 1990, which contained the 400-by-42-foot estimate of
contamination, was incorrect as of 1990. 

 Further supporting the conclusion that both the cost of cleanup and extent of
hazardous materials were correct estimates at the time of closing is the testimony of Brent Bray, staff
geologist for Dames & Moore, who gave the following testimony:


[Question]: As you sit here today, do you have any information that was available
in 1990 that shows the Phase II report and the information disclosed in
the Phase II report was incorrect?


[Bray]: I don't recall any information, no.


[Question]: As you sit here today, do you know of any information that was
available after 1990 that shows that the description of the groundwater
contamination at Beaird contained in the Phase II report was incorrect?


[Bray]: No. 



 Regarding the existence of the Paint Pit on the Beaird property, the record indicates
that neither Ashland nor Trinity was aware of the existence of the Paint Pit at the closing date. 
Trinity argues that the mere existence of the Paint Pit conclusively proves that Ashland breached the
Agreement as a matter of law. To have breached the Agreement, however, Trinity must have proved
that the existence of the Paint Pit constituted the existence of hazardous materials in a manner or
quantity in violation of governmental requirements. 

 Regarding whether the Paint Pit constituted "a violation of law existent at the time
of the sale in April of '90," Ashland's expert witness Dr. Roy Dowling testified as follows:


At the time it was put in there of course the regulations didn't cover it. When the
regulations came into play in the '84 range, '82 range, there was a lot of language
in there where when you past buried things to do something about it. Really, it was
made to make you proactive and take care of your problems on your site. . . . And
when you get to the 1990 standpoint, we probably could take all of the experts that
have testified here and still have some confusion on what had to be reported that
was in that pit versus whether it was lead, whether it was VOCs, a lot of different
issues in that pit.



Because the evidence is indeterminate as to whether the existence of the Paint Pit constituted the
existence of hazardous materials in a manner or quantity in violation of governmental requirements,
we cannot say, as a matter of law, that Ashland breached its representation that there were no
hazardous materials on the property in a manner or quantity in violation of governmental
requirements. Furthermore, the record reveals testimony indicating that the Paint Pit did not
contribute to the groundwater contamination at Beaird. Litherland testified that she could not agree
that the Paint Pit was a source of TCE contamination. Ashland expert Dowling testified that he saw
no indications from any of the test results that the Paint Pit contributed to the groundwater
contamination problem at Beaird. Thus, there is evidence to support the conclusion that the mere
existence of the Paint Pit did not represent a breach of Ashland's representation as to the extent of
hazardous materials located on the Beaird property.


 B. Environmental Costs

 Ashland also represented that 


[w]ith respect to the Subject Property and Governmental requirements in effect as of
the Closing Date, there are no Environmental Costs, there is no Environmental
Noncompliance and Beaird is not aware of, and has not received notice of, any past,
present or future events, conditions, circumstances, activities, practices, incidents,
actions or plans which may result in Environmental Noncompliance or
Environmental Costs.



As part of the Phase II Assessment, Ashland provided a cost estimate for remediation of the
Identified Contamination. Ashland disclosed estimated costs of $81,000 to $102,000 for
remediation, but indicated that this estimate was based on "preliminary costs" and was a
"generalized cost estimate" that "may require modification." Miller, on cross-examination, agreed
that this cost estimate was "based only on the information everybody had at the time regarding the
situation." 

 Trinity argues that Ashland's representations regarding the cost of cleanup were false
because at the time of trial, Trinity had incurred more than $600,000 in costs responding to
environmental conditions at the Beaird facility. In order to have breached the Agreement, however,
Ashland must have made misrepresentations regarding environmental costs as of the closing date. 
As noted above, Bray testified that he had no information that the Phase II Assessment and the
information disclosed in that report were incorrect at that time. Such testimony constitutes some
evidence that Ashland did not misrepresent the environmental costs as of the closing date. For the
same reasons, Trinity has not established that Ashland's representations were false as of the closing
date. 


 C. Ownership of Necessary Licenses and Permits 

 Trinity also contends that Ashland's representations concerning Beaird's possession
of necessary permits and compliance with laws were false. In the Agreement, Ashland represented
that "Beaird has complied with all applicable governmental laws and regulations . . . and all building,
zoning and other laws affecting the business of Beaird or any of its properties," and that "Beaird has
all necessary federal, state and local licenses and permits which are currently required for the conduct
of its business." 

 Trinity points to a letter from Dames & Moore to Miller in which Dames & Moore
"tried to explain the rationale by which [it] determined that Beaird Industries required both an air
and a solid waste permit to operate the solid waste incinerator" to support its contention that Beaird
did not have all necessary permits. The letter referenced by Trinity, dated January 23, 1990, states
the following:

Under the present conditions, the facility needs a permit to operate a solid waste
incinerator. If, however, all disposal of solid wastes is ceased and the areas of past
disposal are remediated, then Beaird Industries would only be a generator and not a
disposer. The exemption noted in 5. above thus appears applicable. 



 The opening paragraph of the same letter states, "Where possible, we have indicated
means that Beaird Industries could potentially exempt themselves from the permit requirements." 
The above evidence, however, does not conclusively establish, as a matter of law, that Ashland's
representations concerning Beaird's possession of necessary permits and compliance with laws were
false. The letter is advisory in nature and instead of definitively proving that Beaird required certain
permits not in its possession at the time, the letter recognizes the possibility that Beaird may, in fact,
be exempt from certain permit requirements. 


 D. Compliance with Applicable Laws

 Trinity contends that Ashland's representations that Beaird was in compliance with
applicable laws were false because Beaird violated laws by not reporting the existence of the Paint
Pit, by not reporting the disposal of wastes near the paint booth, by discharging wastes without a
permit into an outfall ditch, and by not having appropriate Spill Prevention and Control
Countermeasures ("SPCC") and Contingency Plans. However, Dowling testified that the alleged
TCE groundwater contamination at Beaird would not be a violation of governmental requirements
and that the Louisiana Department of Environmental Quality would not consider the contamination
a violation because the property is not in a main, public water supply. According to Dowling, "It is
not in any direct drinking source, so it wouldn't be a direct violation." Based on such testimony,
reasonable minds could fail to find that Ashland breached its representations regarding Beaird's
compliance with applicable laws. 


II. Fraud

 Jury questions number six and seven asked, respectively, whether Ashland committed
fraud and/or statutory fraud against Trinity. The jury answered "no" to both questions. Trinity
argues that it proved, as a matter of law, that Ashland committed fraud by making "unqualified
representations to Trinity as to the extent of contamination or the costs of cleanup."

 A common law fraud claim is established by showing proof of the following
elements: a material misrepresentation that was false, was known to be false when made or was
made recklessly as a positive assertion without knowledge of its truth, that was intended to be acted
upon, that was relied upon, and which caused injury. Insurance Co. of N. Am. v. Morris, 981 S.W.2d
667, 674 (Tex. 1998). The elements of statutory fraud under section 27.01 of the Texas Business
and Commerce Code are essentially identical to the elements of common law fraud except that
section 27.01 does not require proof of knowledge or recklessness as a prerequisite to the recovery
of actual damages. Tex. Bus. & Com. Code Ann. § 27.01 (West 1987); see also Burleson State Bank
v. Plunkett, 27 S.W.3d 605, 611 (Tex. App.--Waco 2000, pet. denied). As previously discussed,
the record contains legally and factually sufficient evidence to support the jury's failure to find that
Ashland breached the Agreement by making misrepresentations regarding the extent of
contamination and estimated cost of cleanup. This same evidence constitutes more than a scintilla
of evidence to support the jury's answers to jury questions six and seven. 

 In sum, viewing the evidence in the light most favorable to Ashland, we hold that the
trial court properly denied Trinity's motion for JNOV. We accordingly overrule Trinity's fifth issue.


Failure to Render Judgment on Attorney's Fees

 Before closing, Ashland obtained the Adams Certificates, in which Mr. Adams, then
President of Beaird, certified that all of Ashland's representations and warranties were true and
correct. Ashland maintained that its own representations and warranties concerning the presence of
hazardous materials at Beaird were made in reliance on the Adams Certificates. Ashland thus stood
ready to prove that if Trinity prevailed in holding Ashland liable for misrepresentations regarding
hazardous materials at Beaird, Ashland could then hold Beaird, now owned by Trinity, liable for
those same misrepresentations. Under Ashland's theory, Trinity would in effect collect damages
from itself, if it prevailed at all. After Trinity brought suit against Ashland, Ashland instituted a third
party suit against Beaird, alleging negligent misrepresentation and fraud; the jury found against
Ashland on both claims.

 Trinity then claimed that, by obtaining the Adams Certificates and suing Beaird,
Ashland breached section 6.2 of the Agreement, which provided that "Ashland and their affiliates
shall have each released Beaird from any and all claims, demands, debts and liabilities of any nature
whatsoever." The issue presented was whether Ashland's suit against Beaird for potential 
misrepresentations in the Adams Certificates violated Ashland's contractual agreement to release
Beaird from all claims and liabilities "of any nature whatsoever." At the close of trial, Trinity
requested that the trial court submit the issue of Ashland's breach to the jury. The trial court,
however, refused to submit a liability question on the breach of the release provision, stating:


You don't need to argue to the Jury whether or not the Adams certificate, or the fact
of suing Beaird constitutes a breach of the agreement. That's a question of law for
the Court. 



 The court consequently reserved this issue as a question of law but nonetheless, in
question number eighteen, (4) asked the jury to determine the "reasonable costs of necessary attorney's
fees and expenses incurred by Beaird and paid by Trinity in the defense of Beaird against claims
asserted by Ashland against Beaird in this action." The jury answered: "$250,000." Trinity
thereafter filed a motion for entry of judgment only as to the jury's answers to questions 13, 15, and
18 Part II. The trial court denied Trinity's motion insofar as it sought entry of judgment in favor of
Trinity against Ashland in the amount of $250,000. 

 Trinity now argues that the trial court erred by failing to render judgment in favor of
Trinity for $250,000 in attorney's fees and expenses because Trinity conclusively proved that
Ashland breached the release provision of the Agreement by suing Beaird. 

 Where the evidence is undisputed regarding a person's conduct under a contract, the
court alone must determine whether such conduct shows performance or breach of a contractual
obligation. Callaway v. Overholt, 796 S.W.2d 828, 831 (Tex. App.--Austin 1990, writ denied). 
The question of whether Ashland's conduct in suing Beaird was a breach of the Agreement was
therefore a question of law for the court to decide. When an issue turns on a pure question of law,
we do not give any particular deference to legal conclusions of the trial court and apply a de novo
standard of review. Tenet Health Ltd. v. Zamora, 13 S.W.3d 464, 468 (Tex. App.--Corpus Christi
2000, pet. dism'd w.o.j.). We must therefore determine whether Ashland's contractual obligation
to release Beaird from all claims included the obligation to release Beaird for claims for negligent
misrepresentation or fraud. 

 A release is an agreement or contract in which one party agrees to hold the other
without responsibility for damage or other liability arising out of the transaction involved. Dresser
Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d 505, 508 (Tex. 1993). A release extinguishes a
claim or cause of action and bars recovery on the released matter. Id. Like any other agreement, a
release is subject to the rules of construction governing contracts, Grimes v. Andrews, 997 S.W.2d
877, 881 (Tex. App.--Waco 1999, no pet.), including the tenet that courts will not rewrite
agreements to insert provisions parties could have included or to imply restraints for which they have
not bargained. Tenneco Inc. v. Enterprise Prods. Co., 925 S.W.2d 640, 646 (Tex. 1996).

 To release a claim effectively, the releasing instrument must "mention" the claim to
be released. Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 938 (Tex. 1991). Any claims not
"clearly within the subject matter" of the release are not discharged. Id. Regarding negligence
claims in particular, the "express negligence doctrine" dictates that a party seeking release from that
party's own negligence must express that intent in specific, unambiguous terms within the four
corners of the document. Dresser Indus., Inc., 853 S.W.2d at 508. When indemnity and release
agreements fail the express negligence test, it is generally because either negligence is not
specifically mentioned, or the extent of coverage to be applied was not specified. See Adams
Resources Exploration Corp. v. Resource Drilling, Inc., 761 S.W.2d 63, 65 (Tex. App.--Houston
[14th Dist.] 1988, no writ). 

 Here, section 6.2 of the Agreement, which purports to release Beaird from "all claims
. . . and liabilities . . . of any nature whatsoever," mentions neither negligent misrepresentation nor
fraud. Absent such reference, the Agreement did not release Beaird from claims of negligent
misrepresentation and fraud. Once Trinity brought suit against Ashland for breach of the Agreement
stemming from Ashland's alleged misrepresentations, Ashland was not precluded from asserting the
actions it did against Beaird. We thus agree with the trial court's legal conclusion that Ashland did
not breach the release provision of the Agreement by suing Beaird for negligent misrepresentation
and fraud.

 In general, attorney's fees may not be recovered from an opposing party unless such
recovery is provided for by statute or by contract between the parties. Travelers Indem. Co. of Conn.
v. Mayfield, 923 S.W.2d 590, 593 (Tex. 1996). No such statute or contractual provision here exists. 
The trial court therefore did not err in failing to award attorney's fees to Trinity. We overrule
Trinity's sixth issue. 


Failure to grant new trial

 In its seventh issue, Trinity argues that the trial court erred by denying its motion for
new trial because Trinity proved liability as a matter of law, or, in the alternative, the jury's answers
were against the great weight of the evidence. The appropriate standard of review requires that we
not disturb the trial court's decision to deny a motion for new trial in the absence of an abuse of
discretion. Jackson v. Van Winkle, 660 S.W.2d 807, 809 (Tex. 1983). We have already concluded
that sufficient evidence existed to support the jury findings that (1) Ashland did not fail to comply
with the Agreement, and (2) Ashland did not commit fraud or statutory fraud against Trinity. Thus,
the trial court did not abuse its discretion in overruling Trinity's motion for new trial. 


CONCLUSION

 In sum, the jury was presented with a complicated dispute, which resulted in a trial. 
After listening to numerous witnesses and extensive evidence, the jury resolved the disputed
questions of fact, and we will not disturb these findings on appeal. The trial court's judgment is
accordingly affirmed.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson 

Affirmed

Filed: August 9, 2001

Do Not Publish Released for publication September 20, 2001. Tex. R. App. P. 47.3(c).

1.    The parties have stipulated that "Ashland and ATEC shall be considered one and the
same."
2.    Beaird initially joined Trinity as a plaintiff against Ashland, but at the time of trial, only
Trinity remained as plaintiff. Before trial commenced, however, Ashland brought in Beaird as a
third-party defendant, alleging, among other things, negligent misrepresentation and fraud against
Beaird in the event the trier of fact found that the warranties and representations made by Ashland
regarding the environmental contamination at Beaird were erroneous. 
3.    In any event, if we were to construe the Agreement as unambiguous, the only possible
unambiguous construction we can discern would in fact limit Ashland's liability to $500,000,
notwithstanding any other provision in the Agreement. 
4.    Question number eighteen had two parts; the first part inquired into the reasonable fee
for Trinity's attorneys in its claim against Ashland, while the second part asked about attorney's fees
and expenses paid by Trinity in its defense of Beaird relating to the Ashland's third party claim
against Beaird.