Reversed and Rendered and Opinion filed January 11, 2007








Reversed and Rendered and Opinion filed January 11,
2007.

 




 
 
  
 
 




 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-05-00476-CV

_______________

 

BACM 2001-1 SAN FELIPE ROAD LIMITED PARTNERSHIP; BACM
2001-1 GRAYSON DRIVE LIMITED PARTNERSHIP; BACM 2001-1 LEJUENE DRIVE, LLC; WELLS
FARGO BANK, N.A., TRUSTEE; CAROL JOHNSON, TRUSTEE; KEVIN KEY, TRUSTEE; JAY
JACOBS, TRUSTEE; GMAC COMMERCIAL MORTGAGE CORPORATION; and LENNAR PARTNERS,
INC., Appellants

 

V.

 

TRAFALGAR HOLDINGS I, LTD., ROYAL ST. MORITZ I, LTD.,
LEXINGTON ROYALE, LTD. and RCA HOLDINGS, LTD., Appellees

                                                                                         
                                                      

On Appeal from the 133rd District Court

Harris County, Texas

Trial Court Cause No. 04-24410

                                                                                                    
                                           

 

O P I N I O N








In this
commercial loan dispute, the Borrowers and a related company successfully
argued at trial that a group of documents (collectively denominated the ARepayment Agreement@) modified the repayment terms of
three non-recourse loans, or alternatively, constituted a new contract
regarding these loans.  On appeal, the Lenders argue that the Repayment
Agreement is unenforceable by appellees because it fails to satisfy the Statute
of Frauds, or alternatively, the Borrowers breached the Repayment Agreement. 
The Lenders also challenge the trial court=s calculation and allocation of
liability for damages.  Because we conclude the Repayment Agreement is
unenforceable by appellees under either theory advanced, we reverse and render
judgment that appellees take nothing.

I.  Factual and Procedural History

Trafalgar
Holdings I, Ltd. (ATrafalgar@), Royal St. Moritz I, Ltd. (ARoyal@), and Lexington Royale, Ltd. (ALexington,@ collectively, ABorrowers@) are all owned by RCA Holdings, Ltd.
(ARCA@).  The three Borrowers share a
common ownership form.  Ninety-nine percent of each company is owned by RCA,
and the remaining one percent is owned by a limited liability corporation that
acts as the general partner.  The general partner is also owned by RCA.[1] 
One percent of RCA is owned by Fidelity AS@ Corporation, and the remaining
ninety-nine percent is owned by Bernard Aptaker. 








In March
2001, Bank of America, N.A. (ABOA@) made commercial real estate loans to the Borrowers totaling
$41.4 million, secured by first lien mortgages on three apartment complexes. 
The loans included an $11.08 million loan to Trafalgar, secured by a deed of
trust on the ARegency Arms@ apartment complex in Houston, Texas; a $20.8 million loan to
Royal, secured by a deed of trust on the ARoyal St. Moritz@ apartment complex in Grapevine, Texas;
and a $9.52 million loan to Lexington secured by a deed of trust on the ALexington@ apartment complex in Biloxi,
Mississippi.  Monthly principal and interest payments for the three loans
exceeded $277,000.  Each of the three Borrowers executed a Loan Agreement, a
Promissory Note, and a Deed of Trust (collectively, the ALoan Documents@) in connection with its respective
loan.  Monthly payments were due on the first day of the month, and if not paid
by the tenth day, a four percent late charge was added.  Any payment more than
five days late constituted a default that triggered the Lenders= right to accelerate the loans and
foreclose.

BOA
transferred the loans to a Real Estate Mortgage and Investment Conduit Trust  (AREMIC Trust@).  Wells Fargo Bank, N.A. (AWells Fargo@) was the trustee for the REMIC trust
and was responsible for distributing income from the loans to investors; GMAC
Commercial Mortgage Corporation (AGMAC@) was the Master Servicer responsible
for day-to-day administration of the loans; and Lennar Partners, Inc. (ALennar@) was the Special Servicer
responsible for administering the loans in the event of default (collectively, ALenders@).  Lennar was authorized to modify
loans, but was not authorized to make new loans.

On
January 13, 2004, GMAC notified the Borrowers that the loans would be declared
in default if payment was not received immediately.  GMAC did not receive
payment, and transferred the loans to Lennar for special servicing.  On
February 18, 2004, Arden Karson, a senior vice president and asset manager in
Lennar=s Real Estate Finance and Servicing
Group, sent letter agreements, referred to as Apre-negotiation agreements,@ to each Borrower.  Each
pre-negotiation agreement contained the following clause concerning
modification of the loans:








The Parties acknowledge and agree that no compromise,
consent, release, waiver, or modification agreement or understanding with
respect to the Loan or the Loan Documents shall constitute a legally binding
agreement or contract or have any force or effect whatsoever unless and until
reduced to writing and signed by the authorized representatives of all
necessary Parties to any such agreement.  The Parties acknowledge and agree
that by executing this letter agreement, they are precluded from claiming that
any agreement, consent, waiver, release, or modification, oral, express,
implied, or otherwise, of the Loan or the Loan Documents, has been effected
except in accordance with the terms of this letter.  The Parties further
acknowledge and agree that no Party is obligated to reach any agreement or to negotiate
for the purpose of reaching any agreement with respect to any Borrower request
for consent, waiver, release, or modification of the Loan or Loan Documents.

Bernard Aptaker, owner
and chairman of RCA, signed each pre-negotiation agreement on behalf of the
respective Borrower and warranted that he had authority to do so.

On March
2, 2004, Lennar declared the three loans in default and demanded payment within
ten days.  Nevertheless, Karson and Aptaker continued to negotiate and Karson
asked Aptaker to submit a proposed solution in writing.  On March 23, 2004,
Aptaker sent Karson a Proposal which states in pertinent part:

Pursuant to
our telephone discussions last week, I wish to make a proposal for dealing with
the outstanding mortgages listed above.

 

I request
that the mortgage holders discount the mortgage balances by 20%, and if the
mortgage holders will do so, I will pay the balances less the discount within 4
months, and I will bring the mortgages current immediately.  During the 4
months, we will report and apply all operating income to the mortgage debt.

* * * * *

I believe
that the equity of the borrowers in all of the projects has been adversely
impacted which will increase unless mold remediation is undertaken
immediately.  The cost of such remediation must either be paid with additional
capital or additional debt.  Increasing my capital investment to save my equity
doesn=t make sense at this time, and it is doubtful that any
additional non-recourse debt will be available to cover such costs.  However, I
am determined to save my investment in these properties if it is feasible and
makes sense for me to do so.  Without a substantial discount and the ability to
refinance the mortgages, my chances of remediating and refinancing the
properties will be very difficult.

 

The mortgage holders alternatively may consider taking
back the properties or foreclosing the liens against the properties.  However,
it occurs to me that the cost and risk of doing so will exceed the 20% discount
that I propose . . . .








Karson telephoned Aptaker
on March 25, 2004, but the content of their conversation is disputed.  At
trial, Aptaker testified that Karson verbally agreed to accept the Proposal if
Aptaker would pay $250,000 immediately.  According to Karson, Aptaker was to pay
$250,000 as a Agood faith@ payment prior to their face-to-face negotiations scheduled
for April 5, 2004.  It is undisputed that no payments had been made on any of
the three loans since November 2003, and at the time of this conversation, the
Borrowers= total arrearage including late fees and default interest totaled
approximately $1.98 million.

On March
26, 2004, Aptaker mailed a check for $250,000 to Karson.  His cover letter
stated:

With further reference to my letter and proposal of
March 23, 2004, I am enclosing our cashier=s check in the amount of $250,000 as
was agreed upon during your telephone conference call to us of yesterday, March
25, 2004.  Please apply it to the 3 loans as you deem appropriate.

The enclosed cashier=s check bore the typed notation, AThis payment on the captioned loans
(see attachment) is in confirmation of your previous acceptance of the
agreement contained in our letter of March 23, 2004 (attached).@[2]

Karson
was on vacation on March 29, 2004 when the check was received and negotiated by
Lennar.  After Lennar negotiated the check, Aptaker canceled the meeting
scheduled for April 5, 2004.








On April
6, 2004, Lennar sent forbearance proposals to each Borrower regarding its
respective loan.  Karson called Aptaker on April 14, 2004 to discuss the
Lenders= proposed forbearance agreements, and
although this conversation is also disputed, none of the parties contends that
the Proposal was discussed.  On April 23, 2004, Lennar sent revised forbearance
proposals to the Borrowers.  The Borrowers did not accept any of the proposals
or make any further payments.

On April
26, 2004, Lennar sent the Borrowers a notice of intent to accelerate two of the
three loans unless payment of sums then due was received by May 3, 2004.  On
April 28, 2004, the Borrowers wrote to Lennar stating, AAs confirmed in our letter dated
March 26, 2004, a binding agreement was reached with respect to payoffs of the
outstanding loans . . . .@        Karson telephoned for an
explanation, but her call was not returned.  Lennar=s counsel also wrote to the Borrowers
and received no response.  On May 10, 2004, the  Lenders sent notice that the
Royal St. Moritz property had been posted for foreclosure sale on June 1, 2004.

In
response, RCA and the Borrowers filed suit to enjoin the foreclosure and
asserted claims for breach of contract and declaratory judgment.  They alleged
that the Lenders accepted the terms of the Proposal by negotiating the $250,000
check, then repudiated the agreement by sending forbearance proposals and
attempting to foreclose on one of the properties.  After receiving the petition
and reviewing the allegations, the Lenders tendered a refund of the $250,000
payment, which RCA and the Borrowers refused.








On
September 10, 2004, Lexington entered into a contract to sell the Lexington
apartment complex for $10.75 million, and the buyer tentatively agreed to
assume the mortgage.  The Loan Documents required the Lenders= approval of any assumption of the
loan, but the Lenders did not agree to the assumption because (a) the amount of
the loan principal was disputed; (b) the amount of past due payments, late
fees, and interest the Borrowers would have to pay before the buyer assumed the
loan was disputed; and (c) if the trial court agreed with the Borrowers that
the Lenders had accepted the Proposal, then the terms of the Proposal would
require immediate payment of the outstanding indebtedness rather than an
assumption of the loan.  After receiving the Lenders= response, RCA and the Borrowers
supplemented their petition to allege that the Lenders wrongfully interfered
with the sale of the Lexington property and Awill continue to wrongfully interfere@ in the sales of the other
properties.  The Borrowers subsequently contracted to sell the Regency Arms for
$13.5 million and the Royal St. Moritz for $22.6 million; however, these sales
contracts did not require the buyers to assume the outstanding loans.

Following
a bench trial, the trial court ruled in favor of RCA and the Borrowers,
ordering Lennar, GMAC, and Wells Fargo to pay them $6,640,222 for the lost
benefit of the twenty percent discount; $5,690,011 for lost equity from the
prospective sales of the properties; more than $280,855 for prejudgment
interest; $300,000 for attorneys= fees through trial; and conditional
attorneys= fees of $150,000 for the costs of appeal and review by the Texas Supreme
Court.  

II.  Issues Presented

In four
issues, the Lenders argue that (a) the Statute of Frauds bars enforcement of
the alleged Repayment Agreement because it is not in writing, does not include
all essential terms of the agreement, and is not signed by the party to be
charged; (b) in the alternative, the Borrowers= own breach of the Repayment
Agreement precludes appellees from enforcing it; (c) the evidence is
legally insufficient to sustain the award of damages; and (d) the evidence
is legally insufficient to sustain a judgment against GMAC because it is not a
party to the loans in question and was not involved in the events at issue.

III.  Analysis

A.        The Statute of Frauds 

1.         Standard of Review








The
trial court=s judgment is predicated on its conclusion of law that the Repayment
Agreement satisfies the Statute of Frauds.  We review the trial court=s conclusions of law de novo.  Smith
v. Smith, 22 S.W.3d 140, 149 (Tex. App.CHouston [14th Dist.] 2000, no pet.). 
When performing a de novo review, we exercise our own judgment and redetermine
each legal issue.  Quick v. City of Austin, 7 S.W.3d 109, 116 (Tex.
1998).  We will uphold conclusions of law on appeal if the judgment can be
sustained on any legal theory the evidence supports.  Waggoner v. Morrow,
932 S.W.2d 627, 631 (Tex. App.CHouston [14th Dist.] 1996, no writ).  Incorrect conclusions
of law do not require reversal if the controlling findings of fact support the
judgment under a correct legal theory.  Id.

2.         Construction of the
Repayment Agreement

Appellees
argue that the Repayment Agreement is an executory accord that essentially
substitutes a new contract for the original Loan Documents.[3] 
In the alternative, appellees argue that the Repayment Agreement is a
modification of the original Loan Documents.  We address both theories of
liability.

a.         The Repayment Agreement as
a New Contract








To
satisfy the Statute of Frauds, all loan agreements involving amounts exceeding
$50,000 must be in writing.  Tex. Bus.
& Com. Code Ann. ' 26.02 (Vernon 2002).  Specifically, Athere must be a written memorandum
which is complete within itself in every material detail and which contains all
of the essential elements of the agreement so that the contract can be
ascertained from the writings without resorting to oral testimony.@  Cohen v. McCutchin, 565
S.W.2d 230, 232 (Tex. 1978).  The written memorandum must, within itself or by
reference to other writings and without resort to parol evidence, contain all
the elements of a valid contract, including an identification of both the
subject matter of the contract and the parties to the contract.  Dobson v.
Metro Label Corp., 786 S.W.2d 63, 65 (Tex. App.CDallas 1990, no writ).  In a contract
to loan money, the material terms also include the amount to be loaned, the
maturity date of the loan, the interest rate, and the repayment terms.  T.O.
Stanley Boot Co., Inc. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex.
1992).  Finally, the agreement must be signed Aby the party to be bound or by that
party=s authorized representative.@  Tex.
Bus. & Com. Code Ann. ' 26.02(b) (Vernon 2002). 

At
trial, appellees argued and the trial court agreed that the Repayment Agreement
consists of the Proposal, the $250,000 check with its endorsements, and the
cover letter accompanying the check.  Construing the Repayment Agreement as a
new contract and reviewing only these written documents without reference to
parol evidence, we are unable to ascertain several essential terms with
certainty.  

First,
we cannot determine the identities of the parties to the Repayment Agreement. 
Appellees argue on appeal that in the Proposal, RCA promised to bring the loans
current immediately and pay off the mortgage balances within four months in
exchange for a twenty percent reduction on the mortgage balances.  But, the
Proposal contains no promises by RCA.  Although the Proposal is typed on RCA=s letterhead, it is signed ABernard Aptaker, Chairman of the
Board of the General Partner.@  Our review of the record reveals that RCA=s general partner is identified in
the original Loan Documents as Fidelity AS@ Corporation.  Thus, it appears that
the promisor is Fidelity AS@ Corporation, an entity not named in any of the documents
forming the Repayment Agreement.  

Moreover,
the trial court impliedly found Aptaker to be a party to the agreement,
specifically finding that Athe promise by AptakerCa nonrecourse borrowerCto bring the debt current using in
whole or in part Plaintiffs= personal funds was new consideration not
contemplated by the original agreement between the parties.@ (emphasis added).  This finding of
fact is apparently based on the following passage from the Proposal:

I request that the mortgage holders discount the
mortgage balances by 20%, and if the mortgage holders will do so, I will pay
the balances less the discount within 4 months and I will bring the mortgages
current immediately . . . .








But, Aptaker is not a
party to this action, nor does the Proposal require or even mention the use of
personal funds.  The trial court also allowed recovery to RCA, although RCA is
not a party to the original Loan Documents or named as a party in the Repayment
Agreement.  In sum, it is not clear whether the offer contemplates Aptaker,
RCA, or Fidelity AS@ Corporation acting as a guarantor, surety, becoming
primarily liable, or simply paying the Borrowers= debt.        

The
Repayment Agreement=s failure to specify the parties to the agreement is not the
only critical omission. It is axiomatic that to satisfy the Statute of Frauds,
a multimillion dollar loan real estate loan agreement must identify the rate of
interest.  See T.O. Stanley Boot Co., Inc., 847 S.W.2d at 221.  The
Proposal contains no mention of interest whatsoever.[4]









By
omitting essential terms such as the applicable interest rate and the
identities of the parties, the Repayment Agreement, if treated as a new
contract, contains insufficient information to satisfy the Statute of Frauds. 
Although RCA and the Borrowers imply that these omissions are immaterial
because an executory accord is not required to satisfy the Statute of Frauds,
none of the cases appellees cite concerning executory accord support this
proposition.  To the contrary, the cases on which appellees rely are
distinguishable because they do not address transactions subject to the Statute
of Frauds.  See, e.g., Alexander v. Handley, 136 Tex. 110, 115B17, 146 S.W.2d 740, 742B43 (1941) (concerning an agreement
for payment of a disputed sum owed for legal services); Browning v. Holloway,
620 S.W.2d 611, 616B17 (Tex. Civ. App.CDallas 1981, writ ref=d n.r.e.) (concerning a settlement
agreement intended to resolve litigation over amounts owed from oil and gas
properties).  Finally, there is no evidence in the record that Lennar was 
authorized to enter into new contracts on behalf of BOA, Wells Fargo, or GMAC;
the record reveals only Lennar=s authority to service and modify existing loan agreements. 
Thus, if we were to agree with appellees that the Proposal conveyed the terms
of a new contract, we must also agree with appellants that Lennar was not
authorized to accept it. 

In sum,
we conclude the Statute of Frauds bars enforcement of the Repayment Agreement
as a new contract and sustain that portion of appellants= first issue.  However, appellees= alternative theory of liability
characterizes the Repayment Agreement as a modification of the original Loan
Documents.  We therefore next determine whether the trial court=s conclusion that the Repayment
Agreement is enforceable can be affirmed by construing the Repayment Agreement
as a modification of an existing contract.

b.         The Repayment Agreement as
a Modification

A
contract required to be in writing cannot be orally modified except in limited
circumstances inapplicable here.  See Givens v. Dougherty, 671 S.W.2d
877, 878 (Tex. 1984).  Specifically, parties to a written contract that is
within the provisions of the Statute of Frauds:

. . . may not by mere oral agreement alter one or more
of the terms thereof and thus make a new contract resting partly in writing and
partly in parol, the reason for the rule being that, when such alteration is
made, part of the contract has to be proven by parol evidence, and the contract
is thus exposed to all the evils which the statute was intended to remedy.          








Dracopoulas v. Rachal, 411 S.W.2d 719, 721 (Tex. 1967)
(quoting Robertson v. Melton, 131 Tex. 325, 115 S.W.2d 624 (1938)). 
But, a modification to a contract need not restate all the essential terms of
the original agreement.  A modification alters only those terms of the original
agreement to which it refers, leaving intact those unmentioned portions of the
original agreement that are not inconsistent with the modification.  See
Boudreaux Civic Ass=n v. Cox, 882 S.W.2d 543, 547B48 (Tex. App.CHouston [1st Dist.] 1994, no writ) (AA modification to a contract creates
a new contract that includes the new, modified provisions and the unchanged
old provisions.@) (emphasis added).  Thus, if we construe the Repayment
Agreement as a modification, terms not addressed in the Repayment Agreement are
supplied by the original Loan Documents.[5] 
Because the original Loan Documents supply essential terms missing from the
Repayment Agreement, this construction arguably supports the argument that the
agreement satisfies the Statute of Frauds.

The
Lenders argue that if the Repayment Agreement is a valid modification, it was
repudiated or breached by the Borrowers= nonpayment.  We therefore address
this argument as well.

B.        Breach
of Contract

1.         Standard of Review

Whether
a party has breached a contract is a question of law.  Aguiar v. Segal,
167 S.W.3d 443, 450 (Tex. App.CHouston [14th Dist.] 2005, pet. denied); Trinity Indus.,
Inc. v. Ashland, Inc., 53 S.W.3d 852, 868 (Tex. App.CAustin 2001, pet. denied) (AWhere the evidence is undisputed
regarding a person=s conduct under a contract, the court alone must determine
whether such conduct shows performance or breach of a contractual obligation.@).  We review questions of law de
novo, without affording any particular deference to the legal conclusions of
the trial court.  Id.








When a
party materially breaches a contract, the other party is discharged or excused
from further performance.  Mustang Pipeline Co., Inc. v. Driver Pipeline
Co., Inc., 134 S.W.3d 195, 196 (Tex. 2004).  Moreover, it is well
established that upon the failure of a debtor to perform under an executory
accord, the creditor may treat the accord as repudiated and may choose to claim
rights under the original cause of action or the accord.  See Alexander,
136 Tex. at 115B17, 146 S.W.2d at 742B43.[6]


            2.         Borrowers
Breached or Repudiated the Repayment Agreement

The
Lenders argue that even if the Repayment Agreement satisfied the Statute of
Frauds, it is nevertheless unenforceable by appellees because the Borrowers
materially breached the terms of the contract.  See id.  We agree.








The only
terms of the original Loan Documents the Proposal purports to modify are
(a) the amount of principal, (b) the maturity date of the loans, and
(c) certain accounting requirements.  But, the Repayment Agreement does not
alter the dates on which principal and interest payments are due; contains no
mention of the treatment of late fees and default interest that had already
accrued under the original Loan Documents; and does not address the pre-payment
penalties that would be assessed under the original Loan Documents.[7]
Appellees contend that the Proposal excludes these costs because they Ahad no intention of paying themCthey simply were not part of the
deal.@  This position ignores the
undisputed fact that these past and future penalties are part of the original
Loan Documents, and the Proposal contains no request to modify these provisions
of the original agreements.  These terms are not inconsistent with those set
forth in the proposed Repayment Agreement; therefore, these provisions are
incorporated into the modification.  See Boudreaux Civic Ass=n, 882 S.W.2d at 547B48.  Thus, even if the Repayment
Agreement satisfied the Statute of Frauds, the Borrowers did not perform their
obligations and never intended to do so.

Appellees
argue that payment of a $7.5 million prepayment penalty, previously accrued
late fees, and enhanced interest would defeat the purpose of the proposed
modification, and hence, were not incorporated into the Repayment Agreement
because these provisions are inconsistent with the terms of the Proposal.  We
disagree.  The Borrowers would not incur a prepayment penalty unless the loans
were prepaid before the maturity date.  By accelerating the maturity date to a
date only four months away, the Borrowers would not incur prepayment penalties
unless the loans were prepaid in less than four months.  Accordingly, the Borrowers
could forego years of future interest payments without penalty.  Additionally,
the value of the twenty percent reduction in principal substantially exceeds
the amount of previously accrued late fees and enhanced interest that were
required to be brought current immediately.                       








Appellees= refusal to pay late fees and
enhanced interest is not the only example of their  nonperformance.  Under the
terms of Proposal, the Borrowers (and possibly Aptaker, RCA, or Fidelity AS@ Corporation) agreed to bring the
arrearages current Aimmediately.@  In interpreting this provision, we give terms their plain,
ordinary, and generally accepted meaning unless the instrument shows that the
parties used them in a technical or different sense.  Heritage Res., Inc. v.
NationsBank, 939 S.W.2d 118, 121 (Tex. 1996).  AImmediately@ means Awithout interval of time, without
delay, straightway, or without any delay or lapse of time.@  Black=s Law Dictionary 750 (6th ed. 1990); see also Webster=s Ninth New Collegiate Dictionary 601 (9th ed. 1991) (defining Aimmediately@ as Awithout interval of time; straightway@).  On the facts before us, the offer
to bring the loans current Aimmediately@ meant, at a minimum, that the Borrowers would not allow the
arrearages to increase and payments to be delayed to the point that the Lenders
had grounds to foreclose under the terms of the original Loan Documents that
remained in force.  However, the Borrowers did not bring the arrearages current
Aimmediately.@  The Lenders were not paid by the
time the next payment was due on April 1, 2004; moreover, the Lenders were not
paid within five days of the due date, even though any payment more than five
days late was a default that triggered the Lenders= right to accelerate the loans and
foreclose.[8]  Because the
Lenders did not receive the April payment by that date, a new default condition
arose.[9]  The
Borrowers also did not bring the loans current or make the April payment within
ten days of the due date, thereby triggering enhanced interest charges of an
additional four percent and causing the total amount of the arrearages to
increase still further.  In fact, it is undisputed that the Lenders never
received another payment after endorsing the $250,000 check that purportedly
confirmed the Repayment Agreement.  As previously discussed, the Borrowers
never intended to bring the total arrearages current, because they did not
intend to pay the previously accrued late fees or the enhanced interest
payments at all.  








The
trial court=s findings of fact and conclusions of law suggest the trial court
concluded that the Repayment Agreement incorporated only those terms from the original
Loan Documents that are specifically mentioned in the Proposal, and applied a
more elastic definition of the word Aimmediately.@  However, if the Repayment Agreement
was intended to completely replace the original Loan Documents, it is
unenforceable because it does not satisfy the Statute of Frauds.  In order to
supply missing essential terms, the Repayment AgreementCincluding the word Aimmediately@Cmust instead be interpreted as a
modification of the original Loan Documents and read in conjunction with them. 
Under the Loan Documents, payments are due on the first of the month.  If
payments are not made by the fifth of the month, the Borrower is in default and
the Lenders have the right to begin foreclosure proceedings.  Therefore,  Aimmediately@ cannot reasonably be construed to
mean a date later than the date of default.

On the
record before us, we hold that the Lenders were entitled to treat the Repayment
Agreement as repudiated, and to pursue remedies for default under the original
Loan Documents. See Alexander, 136 Tex. at 115B17, 146 S.W.2d at 742B43.  These remedies included the
right to pursue the non-judicial foreclosure sale that triggered this lawsuit.

Interpreting
the Repayment Agreement as a contract modification, we sustain the Lenders= second issue.  Because our
disposition of the Lenders= first two issues requires us to reverse and render judgment
that appellees take nothing, we do not reach the Lenders= remaining arguments and issues.

IV.  Conclusion

For the
foregoing reasons, we reverse and render judgment that appellees Trafalgar
Holdings I, Ltd., Royal St. Moritz I, Ltd., Lexington Royale, Ltd. and RCA
Holdings, Ltd. take nothing.

 

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered and Opinion filed
January 11, 2007.

Panel consists of Justices Anderson,
Hudson, and Guzman. 

 









[1]  Opteka, L.L.C. (AOpteka@) is the general partner in the Lexington and
Trafalgar limited partnerships.  Opteka is also the sole owner of Royal
Grayson, L.L.C., the general partner in the Royal limited partnership. RCA is
the sole owner of Opteka.





[2]  It does not appear from the record that a copy of
the Proposal was attached.





[3]  But see Pac. Employers Ins. Co. v. Brannon,
150 Tex. 441, 448, 242 S.W.2d 185, 189 (1951) (distinguishing the law of accord
from that of novation, and stating that Aa
mere accord does not necessarily supersede the original claim . . . .@).





[4]  We further note that appellees= own evidence and argument suggest that the $250,000
payment was not merely material, but was an essential term.  But, no such
payment is mentioned in the Proposal, and appellees= explanation for the payment relies on parol evidence.





[5]  Appellants argue that the Repayment Agreement rests
partly in parol because there is no written explanation for the $250,000
check.  We will assume for the purposes of this discussion that the payment
properly could be treated as a partial payment of the outstanding arrearages
under the original Loan Documents, and thus, needed no further written explanation. 
This is, in fact, how Lennar applied the payment.





[6]  See also Votzmeyer v. Votzmeyer, 964 S.W.2d
315, 320 (Tex. App.CCorpus Christi 1998, no pet.) (holding that the
nonbreaching party Ais within her rights to choose to enforce the original
judgment rather than seek enforcement of the later agreement@); Browning, 620 S.W.2d at 616 (AA party could not be expected to exchange what, on its
face, is a matured claim capable of accurate determination for an agreement
that is not complete in its terms, and which thereby might not resolve all of
the issues between the parties. We hold that the agreement is at best an
executory accord, and, upon repudiation, a party may sue either upon the accord
or upon the underlying cause of action.@).





[7]  Under the original Loan Documents, the prepayment
described in the Repayment Agreement would result in penalties of approximately
$7.5 million.





[8]  These critical dates were not modified or even
mentioned in the Proposal; thus, they remained in effect. 





[9]  Although the Repayment Agreement required the
Borrowers to Areport and apply all operating income to the mortgage
debt,@ there is no evidence in the record that the Borrowers
performed this obligation by the first of the month, the fifth of the month, or
at any other time.  Thus, even if we interpreted the Repayment Agreement as
allowing the Borrowers additional time to pay the arrearages that had already
accrued, we are still confronted with the Borrowers= failure to make current payments as they became due.