COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

FASKEN LAND AND MINERALS,
LTD.,         )

CRANE AVENUE, INC.,  and 
D.H.                    )

ACQUISITION, LTD.,                                         )             
No.  08-03-00407-CV

                                                                              )

Appellants,                         )                   Appeal from the

                                                                              )

v.                                                                           )               
385th District Court

                                                                              )

OCCIDENTAL PERMIAN LTD., OXY
USA,     )            of Midland County, Texas

INC., and OCCIDENTAL
PETROLEUM            )

CORPORATION,                                                )                
(TC# CV-43,029)

                                                                              )

Appellees.                          )

 

O
P I N I O N

 








This is yet
another oil and gas case originating from the attempted removal of an operator
under an operating agreement.  But it is
of historic note as it may be the last oil and gas case from the Permian Basin
that will reach this Court -- certainly, the last one from Midland County[1].   The Appellants Fasken Land and Minerals,
Ltd., Crane Avenue, Inc., and D.H. Acquisition, Ltd. (collectively AFasken entities@)
appeal from a take-nothing judgment rendered in favor of Appellees Occidental
Permian Ltd. (AOPL@), OXY USA, Inc., and Occidental
Petroleum Corporation (AOPC@).[2]  Appellants sued Appellees for inter alia alleged
breaches of an oil and gas unit operating agreement, concerning the provisions
related to operator removal and election of a successor, and Fasken entities= preferential purchase right.[3]  Fasken entities also sought a declaratory
judgment on their preferential purchase right and OPL=s
removal as Unit Operator and its successor=s
election under the Unit Operating Agreement.[4]  On appeal, Fasken entities bring four issues,
in which they assert the trial court erred: 
(1) by refusing to award them administrative overhead charges paid to
OPL; (2) by failing to render judgment that D.H. Acquisition, Ltd. is the
successor Unit Operator; (3) by failing to declare the preferential purchase
right notice invalid or alternatively erred by improperly instructing the jury;
and (4) by impermissibly taxing certain items as costs.  We affirm.








Fasken entities
and OPL are working interest owners of the Midland Farms Unit (AMFU@),
an oil and gas unit located on C Ranch in Andrews County, Texas.  In 1913, David Fasken bought the C Ranch,
which then consisted of 250,000 acres northwest of Midland.  In the 1940s, Fasken family members leased
out a portion of the property to Stanolind Oil Company.  The Faskens retained a royalty interest in
three-quarters of the property under the lease and held a working interest in
one-quarter of the property.  In the
early 1960s, the property was unitized and divided into tracts for purposes of
initiating secondary recovery operations. 
As a result, Pan American Oil Company (APan
American@),
formerly Stanolind, held approximately 75 percent of the working interest over
the entire acreage covered by the unit. 
In 1961, the working interest owners and royalty owners executed a Unit
Agreement and a Unit Operating Agreement. 
The Unit Agreement was incorporated into the Unit Operating Agreement by
reference and Pan American was designated as the initial Unit Operator.  Pan American, which later became American Oil
Company (AAMOCO@) operated the Unit for several
decades.

In 1995, Fasken
entities initiated an audit of the MFU, and thereafter claimed a number of
exceptions to its joint interest billing charges as a working interest owner of
the Unit.  Fasken entities later filed
suit against AMOCO over the accounting issues and its operational practices and
also attempted to remove it as operator. 
As part of the settlement of that lawsuit, the Unit Operating Agreement
was amended to include a preferential right to purchase provision, contained in
Article 24.  In settlement negotiations,
Fasken entities also agreed to the transfer of AMOCO=s
75 percent working interest in the MFU to Altura Energy Ltd. (AAltura@),
a limited partnership formed between AMOCO and Shell Oil Company in 1997 to
operate their Permian basin assets as a single entity.








The present
lawsuit arises from the purchase of Altura=s
working interest in the MFU by OPC through one of its subsidiaries in April
2000.  In 1999, OPC, a Los Angeles-based
oil and gas company, learned that AMOCO and Shell were considering selling the
Altura properties.  OPC expressed its
interest in the assets and later received a formal letter inviting it to be
part of the bidding process for the Altura acquisition.  According to the letter, Altura was focusing
its effort on companies that had expressed an interest in acquiring Altura in
its entirety.[5]  As a result of a multi-step bidding process,
OPC was selected as the potential purchaser and if offered to purchase 100
percent of the Altura assets for approximately $3,550,000,000.  The total purchase price included a small
amount of assumed liabilities which added another $50 million to the
transaction.  AMOCO and Shell accepted
the offer and the parties began negotiating the terms of the purchase and sale
agreement.

During the due
diligence process, OPC personnel and AMOCO representatives discussed whether
the transaction triggered the provision for preferential right to purchase the
MFU asset.  OPC did not believe that the
provision would be triggered by the transaction, but AMOCO felt strongly that
it should offer the MFU as a preferential right.  The MFU was the only Altura partnership interest
that was subject to a preferential right.








Jim Lyerly, Senior
Vice President in Financial Planning Analysis for Occidental Oil and Gas
Company, an OPC subsidiary was part of the acquisitions team.  Mr. Lyerly volunteered to work on the
allocation of the purchase price for the MFU. 
In his testimony, Mr. Lyerly explained how he arrived at the later
disputed $63 million figure as the allocation of the purchase price for the
MFU.  Since OPC was the buyer, they were
asked to determine the allocated price of MFU, rather than have the seller make
the determination outright, because they would know what they were paying for
it.  Mr. Lyerly knew the purchase price
for the Altura properties was $3.8 billion in terms of total asset value and
$3.6 billion in terms of the dollar amount. 
In undertaking to determine the allocated price for the MFU component,
Mr. Lyerly first asked Terry Lindquist and Ed Behm, engineers experienced at
building development and exploitation programs, to build a technical case for
the value of the property, that is, an analysis of the projects based on
technical matters in engineering and geology. 
Mr. Lyerly explained that the value of the property is centered on
future capital, including the capability of reserves projects beyond the proved
developed resources.








Before receiving
the engineers=
independent opinion, Mr. Lyerly conducted his own analysis, relying primarily
on the Netherland Sewell reserve report, which evaluated all the Altura
properties in the acquisition.[6]  The Netherland Sewell report provided data on
the properties in aggregate form -- on more than 8,000 wells, of which the MFU
interest was just a component.  Mr.
Lyerly knew the general background assumptions underlying all the evaluations
in the report.  In his evaluation, he
adjusted for differences in their global assumptions and their discount rate
for instance.  Mr. Lyerly cut the MFU=s probable reserves numbers in half in
his assessment, but made no adjustment to the proved developed reserve numbers
or the proved developed nonproducing reserve numbers.  In Mr. Lyerly=s
opinion, the MFU had significantly more potential on average than all the other
properties.  He believed that a lot of
oil had not been developed yet, thus, this particular property had a Adisproportionate amount of upside.@ 
Mr. Lyerly then met with Mr. Lindquist and Mr. Behm and in their
view there was tremendous potential in these properties.  According to Mr. Lyerly, their evaluation was
higher than his $63 million figure.  He
asked if they could support the $63 million figure and their answer was yes
because their valuation actually supported a much higher number.

Concurrently with
the OPC allocation process, Lon Buehner, an executive of AMOCO, had discussions
internally with Stanley Davidson (ADavid@) Grubb, Jr., the director of the
acquisitions and divestments group, about the allocated value of the MFU in the
Altura acquisition.  There had been no
agreement on the purchase price for Altura when Mr. Buehner first talked to Mr.
Grubb and asked him to prepare a valuation of the MFU.  Mr. Grubb tabulated information on the MFU,
relying mostly on the numbers in the Netherland Sewell report.  Mr. Grubb stated that no risking was
done in the Netherland Sewell report.  He
prepared a table of information which he gave to Mr. Buehner.  Mr. Grubb did not know the purchase price and
never did any other work related to allocating a portion of the purchase price
to MFU.  Mr. Grubb explained that
the Asell@ side never does the allocation.  Rather, the seller looks at the allocation
done by the buyer for a reasonableness check. 
Mr. Grubb knew that the information he provided to Mr. Buehner was for
the purpose of checking that the allocated value was reasonable and within the
bounds of petroleum engineering practices.








Mr. Buehner had a
conversation with Mr. Grubb about his tabulated information on the MFU.  They discussed the range of values for the
MFU to be as low as $40 million and as high as $110 million, depending on the
risk weighting put on the information.[7]  Mr. Buehner then had a conversation with Mr.
Lyerly about a range of numbers, but Mr. Lyerly indicated that he strongly
believed that OPC had a technical justification for the $63 million figure.  Following that discussion, Mr. Buehner spoke
with Mr. Grubb again and informed him that the OPC value was in the $63 million
range.  According to Mr. Buehner, he and
Mr. Grubb believed that there was a wide range with regard to the potential
value of the MFU because of oil price sensitivity and based on how one would
risk weight the upside of the MFU.  They
concluded that it was feasible for OPC to have a technical case that would
support a value of $63 million.  Mr.
Grubb testified that the $63 million figure looked reasonable to him and that
he never took into account the total purchase price for Altura in his
determination.








Shortly before the
purchase and sale agreement was executed, Mr. Buehner had a second meeting with
Mr. Lyerly.  Mr. Buehner mentioned to him
that the higher end of his previous range of $60 million was very feasible and
Mr. Lyerly reiterated that OPC felt they had a strong technical case that
supported the $63 million figure.  At
that meeting, they determined that $63 million was the figure to be inserted in
the purchase and sale agreement as the allocation of the purchase price for the
MFU.  Mr. Buehner also testified that the
AMOCO legal department asked if $63 million was the appropriate value to be
allocated to the MFU from the purchase price and he told them he believed it
was.  The parties ultimately executed the
purchase and sale agreement, which listed the $63 million figure as the
allocation of the purchase price attributable to the MFU in Article 3.2 (b) of
the purchase and sale agreement.[8]

On March 22, 2000,
Altura sent a letter to each of the Fasken entities, notifying them that Altura
had executed a purchase and sale agreement to sell a portion of their
partnership interests to OPC.  The letter
stated that pursuant to Article 24 of the Unit Operating Agreement, the
nonoperating working interest owners in the MFU may have a preferential right
to purchase Altura=s
interest in the MFU.[9]  The letter notified Fasken entities that the
allocated value for the MFU was $63 million, payable in cash at or before the
closing date, which was scheduled to occur by April 30, 2000.  A copy of the purchase and sale agreement was
attached, but did not include the exhibits. 
In the letter, Altura requested that Fasken entities respond to the
notice within fifteen days after its receipt if they intended to exercise the
preferential right to purchase the MFU. 
Altura also requested that a copy of the letter be returned to it, with
a mark placed in the space provided as evidence of Fasken entities= election to purchase or not to
purchase the MFU.








Fasken entities
received the Altura letter on March 27, 2000. 
Norbert Dickman, general manager of the Fasken company, Sally Kvasnicka,
the land manager, Mark Merritt, the engineering manager, and general counsel
met and briefly discussed the letter. 
They scanned through the purchase and sale agreement and found the
section that referred to the preferential purchase right for the MFU and
provided that the allocated purchase price was $63 million.

On April 5, 2000,
the Fasken entities sent a letter to Altura requesting more information about
the proposed sale.  In their letter,
Fasken entities stated that it was their position that the proposed sale
triggered Article 24 of the Unit Operating Agreement and that under the terms
of that agreement, they had a right to Asufficient
information to enable them to make an informed decision with respect to whether
or nor to exercise their rights to acquire the Interest.@  Fasken entities asserted that the March 22,
2000 letter failed to satisfy the specific notice requirements of Article
24.  Specifically, Fasken entities
complained that the document they received was incomplete in that it was missing
the referenced exhibits, which they stated were essential to their informed
decision.  Fasken entities also
complained that neither the March 22 letter nor the attached documents provided
any basis for the $63 million allocation price or for Altura=s assertion that payment in cash at
closing was a term or condition of the proposed sale to which they must agree
in order to acquire the MFU.  Fasken
entities requested that Altura provide them with Aall
documents and other information necessary to verify the basis for the
$63,000,000 allocation, the interest to which the allocation pertains, and
provide an explanation for your assertion that the allocated purchase price is
payable in cash at or before the Closing of the Proposed Sale.@ 
In closing, Fasken entities stated that until they had received all of
the information Altura was required to provide under Article 24, Awe will not consider the fifteen (15)
day notice period to have commenced.@








Fasken Engineering
Manager Mark Merritt testified that after being presented with the $63 million
figure, he began to run the economics on the MFU, which included looking at the
current oil and gas price outlooks and operating expense forecasts, in order to
determine whether $63 million was a reasonable number.  Mr. Merritt made some adjustments to his
calculations because he felt that Fasken could operate the property more
cheaply, but could not come up with that high a value.  The only way he could value the MFU at $63
million was to assume oil prices which at that time seemed outrageously
high.  Mr. Merritt=s
analysis of the MFU placed its value in the range of $35 - $43 million.[10]

On April 10, 2000,
Fasken entities requested a meeting of the working interest owners in the MFU
for the purpose of removing the unit operator, Altura, and to elect a successor
operator.  In explaining this decision,
Mr. Merritt stated that they were concerned about the continual change of
personnel in the operation and felt they could operate the MFU more effectively
and more efficiently.  At the time, the
Fasken company had its affiliate D.H. Acquisitions in mind as the successor
operator.








On April 25, 2000,
Occidental Permian Ltd. (AOPL@), formerly called Altura Energy Ltd.,
sent a letter to the MFU non-operating working interest owners of the MFU.[11]  In the letter, OPL disagreed with Fasken
entities=
objections to the March 22 notice letter, but wrote A[r]ecognizing
that Fasken asked some legitimate questions (although beyond the requirements
of Article 24), we are providing each of you with certain additional
information that Fasken requested.@  OPL also wrote that Aout
of a spirit of cooperation and in light of your request for more information@ it was extending another fifteen day
deadline to the working interest owners to exercise its preferential right to
purchase its interest in the MFU for $63 million.  OPL enclosed a copy of the exhibits to the
purchase and sale agreement, but stated that the exhibits Aaddress the structure of the OPL=s partnership and the sale of interests
in OPL, not the conveyance of the Affected Interest or any particular real
property.@  In response to Fasken entities= request for the basis of the
allocation of 63 million dollars to the MFU, OPL stated that Article 24 did not
require an explanation of the allocation in the event of a sale, A[h]owever, OPL in good faith considers
sixty-three million dollars to be a reasonable allocation of the consideration
to the Affected Interest.@[12]  OPL also explained that it had requested a
cash payment because the sellers were receiving cash in consideration for the
sale of their equity.








Fasken entities
received the second notice letter on April 27. 
In Mr. Merritt=s
opinion, Fasken=s primary
issue was the allocation of the purchase price and the opportunity it presented
to increase the value of the MFU in order to defeat their preferential purchase
right.  Mr. Merritt did not believe the $63
million figure was inconceivable, but he wanted to see what the basis was for
that figure and believed that Article 24 indicated that they were entitled to
full information, including information on the allocation of the purchase
price.  Mr. Dickman also testified that
the primary concern was the issue of sufficient information, that is, the basis
for the $63 million allocation.  Mr.
Dickman also did not believe he could rely on OPL=s
good faith assertion of the allocation because of his fiduciary duties and
because of Mr. Merritt=s
advice that the figure was far off.  

On May 4, 2000,
OPL and Fasken entities held a meeting at the Fasken company offices to discuss
the concerns raised by Fasken entities. 
According to Mr. Dickman, OPL did not provide further information about
how it determined the $63 million figure. 
On May 12, 2000, Mr. Dickman, as the Fasken entities agent, sent a
letter to OPL, informing the company that it had not fully satisfied the notice
requirements under Article 24 because the Afull
information@ term in
Article 24 required an explanation for the basis for the $63 million allocation
to Altura=s
interest in the MFU, which had not been done. 
In the letter, Mr. Dickman stated that: 

It will be Altura=s burden to establish the
reasonableness of that allocation, your refusal to provide even an explanation
of the purported allocation does not satisfy your obligation to provide >full information= concerning a material element of the
PSA.  As such, your attempted notice
remains ineffective to impose any deadlines for the exercise of the Fasken
Entities= rights
under Article 24.

 








Mr. Dickman also asserted that the
Fasken entities wished to exercise their rights to purchase the MFU interest,
but had been denied that opportunity and considered OPL to be in material
breach of the Unit Operating Agreement. 
Mr. Dickman requested a stated basis for the allocation and full
information Aconcerning
how that allocation was made and why it was considered to be reasonable.@ 
On behalf of the Fasken entities, Mr. Dickman also proposed an offer to
purchase the MFU interest for $38,000,000 before June 1, 2000, Ain an effort to resolve this matter
without the need for protracted and expensive litigation . . . .@[13]  On June 9, 2000, the Fasken entities filed
their original petition in this lawsuit.

On June 16, 2000,
the MFU working interest owners met in Fasken=s
offices in Midland.  At the time of the
meeting, OPL owned almost 75 percent of the working interest, the Fasken
entities collectively owned less than 24 percent, and Lowe Partners LP (ALowe Partners@)
and Valence Operating Company (AValence@) each owned less than 1 percent.  Mr. Behm acted as chairman and was the
representative for OPL.  The first item
on the agenda was a vote to remove OPL as the operator.  OPL voted its 74.67 percent interest against
removal.  The Fasken entities, Lowe
Partners and Valence voted their combined 25.32 percent interest in favor of
OPL=s removal as operator.[14]








The next item
considered at the meeting was the nomination of a successor operator of the
MFU.  Mr. Dickman nominated D.H.
Acquisition and the Fasken entities, Lowe Partners, and Valence voted their
combined interest in favor of D.H. Acquisition as the successor operator.  OPL voted its 74.67 percent  interest against the nomination.  The meeting minutes show that Mr. Behm stated
that the item failed and the ballot sheet reflects that the vote did not carry.  After the voting, Mr. Dickman stated that OPL
had been removed as operator and  D.H.
Acquisition had been properly elected and demanded that operations be
transferred to D.H. Acquisition. 
Mr. Behm responded that OPL would continue to operate the MFU in
good faith until a successor operator had been properly elected.[15]

Mr. Oenbring
testified that he received a letter from Ms. Kvasnicka, on behalf of D.H.
Acquisition, requesting that OPL turn over operations of the MFU to D.H.
Acquisition.  Mr. Oenbring replied to the
letter, stating that D.H. Acquisition did not receive sufficient votes to be
selected as successor operator and that OPL would continue to operate the MFU
until there was a duly elected successor operator.[16]  Fasken later amended its original petition in
the lawsuit to include breach of contract claims for OPL=s
refusal to accede to its removal as Unit Operator, its refusal to acknowledge
D.H. Acquisition=s
election as its successor, and its refusal to turn over MFU operations to D.H.
Acquisition.  Fasken also requested a
declaratory judgment stating that OPL was removed as Unit Operator of the MFU
and that D.H. Acquisition was duly elected as the successor Unit Operator.








Prior to the jury
trial, Fasken moved for partial summary judgment on the issues of whether OPL
was removed as Unit Operator of the MFU and whether D.H. Acquisition was duly
elected as its successor.  The trial
court granted summary judgment on the removal issue, concluding that OPL was
removed as Unit Operator of the MFU on June 16, 2000, however, the trial court
denied Fasken=s motion
in all other respects.  The trial court
submitted five questions to the jury. 
The first two questions concerned the alleged breach of Article 24.1
(the preferential right provision).  The
remaining questions concerned Fasken entities=
alleged damages for OPL continuing to act as Unit Operator after June 16, 2000
and their reasonable attorney=s
fees related to the breach of contract claim. 
The jury answered all questions in favor of OPL.  Fasken entities filed a motion for judgment
notwithstanding the verdict, in which they argued inter alia that the
evidence established as a matter of law: 
(1) that OPL had failed to comply with the notice provisions of Article
24.1; (2) that Fasken was entitled to recover on the claim for administrative
overhead paid to OPL after June 30, 2000; and (3) that D.H. Acquisition had
been elected successor Operator.  The
trial court denied Fasken entities=
motion and rendered judgment on the jury=s
verdict that the Fasken entities take nothing from the defendants.

We begin our
discussion with Issue Three where Fasken entities complain that the trial court
erred in failing to declare OPL=s
notice invalid because there was no evidence that OPL provided Afull information,@ as required under Article 24.1, which
they argue meant information about how the allocation of value for the MFU was
calculated, in addition to the four items specifically listed in the Unit
Operating Agreement.  We understand
Fasken entities= argument
to be that the trial court erred in construing Article 24.1 and under a correct
interpretation of that provision, the evidence at trial established as a matter
of law that OPL failed to comply with Article 24.1.








The parties= dispute entails the interpretation of
the Unit Operating Agreement.  On appeal
there is no dispute among the parties that their agreement was an unambiguous
contract.  Construing an unambiguous
contract involves a question of law, which we review de novo.  MCI Telecommunications Corporation v.
Texas Utilities Electric Company, 995 S.W.2d 647, 650-51 (Tex. 1999); Coker
v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). 
In construing an unambiguous contract, a court should attempt to
harmonize and give effect to all provisions so that none is rendered
meaningless.  MCI Telecommunications
Corp., 995 S.W.2d at 650-51; Coker, 650 S.W.2d at 393.  We give terms their plain, ordinary, and
generally accepted meaning unless the instrument requires otherwise.  Sun Operating, Ltd. v. Holt, 984
S.W.2d 277, 285 (Tex.App.--Amarillo 1998, pet. denied).  The primary concern of a court when
construing a written contract is to ascertain the true intent of the parties as
expressed in the instrument.  National
Union Fire Insurance Co. of Pittsburgh, PA v. CBI Industries, Inc., 907
S.W.2d 517, 520 (Tex. 1995).  When the
parties disagree over the meaning of an unambiguous contract, we must determine
the parties= intent
from the agreement itself, not from the parties=
present interpretation.  Hill v.
Heritage Resources, Inc., 964 S.W.2d 89, 139 (Tex.App.--El Paso 1997, pet.
denied).  Further, we will not rewrite
contracts to insert provisions parties could have included or imply restraints
for which they have not bargained. 
Tenneco Inc. v. Enterprise Products Co., 925 S.W.2d 640, 646 (Tex.
1996).








A preferential
right is a preemptive right, which requires a property owner to first offer the
property to the right holder at the stipulated price and terms in the event the
owner decides to sell the property.  Riley
v. Campeau Homes (Texas), Inc., 808 S.W.2d 184, 187 (Tex.App.--Houston
[14th Dist.] 1991, writ dism=d
by agr.); Holland v. Fleming, 728 S.W.2d 820, 822 (Tex.App.--Houston
[1st Dist.] 1987, writ ref=d
n.r.e.).  Until the right is triggered,
its holder may not compel the property owner to sell.  Riley, 808 S.W.2d at 187.  However, once an owner decides to sell, the
owner is obligated to offer the right holder the opportunity to buy the
property on the terms offered by a bona fide purchaser.  Id. at 187; Holland, 728 S.W.2d
at 823.

Article 24.1 of
the Unit Operating Agreement provides working interest owners with a
preferential right to purchase an affected interest in the MFU in the event of
a sale or transfer of that interest. 
Specifically, Article 24.1 provides in part: 

Preferential Right to Purchase.  Should any party hereto desire to sell or
otherwise assign, transfer or dispose of its interest in the oil and gas estate
under this agreement or in the Unit Area, or should any party hereto desire to
sell, assign or otherwise transfer ownership or control of ownership of the
business entity that is a party or a successor to a party to this Agreement,
such party shall promptly give written notice to the other parties, with full
information concerning its proposed sale, assignment, transfer of ownership or
transfer of control of ownership; or other disposition, which notice shall
include:  (1) the name and address of the
prospective purchaser, assignee, or transferee (who must be ready, willing and
able to purchase or accept the transfer); (2) the purchase price or in the
event of the transfer of a business entity or group of properties, an
allocation of that portion of the purchase price attributable to its interest
in the oil and gas estate under this Agreement or in the Unit Area; (3) a legal
description sufficient to identify the property and interest; and (4) all other
terms of the proposed sale, or transfer of control or ownership.  The other parties shall then have an optional
preferential or preemptive right, for a period of fifteen (15) days after the
notice is received to purchase the interest in the oil and gas estate under
this Agreement or in the Unit Area offered, or subject of the sale or the
transfer, for the stated consideration and on the same terms and
conditions.  If this optional right is
exercised by more than one of the other parties, the purchasing parties shall
share ownership of the purchased interest in the proportions that the interest
of each bears to the total interest of all purchasing parties.

 








Under Fasken entities= asserted interpretation of Article
24.1, they were Aentitled
to full information concerning the proposed sale, assignment, transfer of
ownership or transfer of control of ownership, or other disposition of the
interest in the Midland Farms Unit, including the four categories of
information expressed in the Unit Operating Agreement.@  [Emphasis added].   Fasken entities argue that the plain meaning
of the language in Article 24.1 required OPL to provide Afull
information,@ which
included how the allocation of the purchase price attributable to the MFU was
calculated, in order to activate the time for them to exercise their
preferential purchase right.  We cannot
agree with Fasken entities=
position, however, because doing so would certainly defeat the purpose of the
written notice provision and further, such an interpretation fails to give
effect to the parties=
intention as expressed in the agreement itself. 
The clear purpose of Article 24.1 is to provide prompt written notice of
any proposed sale, assignment, transfer of ownership or transfer of control of
ownership of an affected interest. 
Article 24.1 enumerates four specific items which Ashall@
be included in said written notice, that is, A(1)
the name and address of the prospective purchaser, assignee, or transferee (who
must be ready, willing and able to purchase or accept the transfer); (2) the
purchase price or in the event of the transfer of a business entity or group of
properties, an allocation of that portion of the purchase price attributable to
its interest in the oil and gas estate under this Agreement or in the Unit
Area; (3) a legal description sufficient to identify the property and interest;
and (4) all other terms of the proposed sale, or transfer of control or
ownership.@  By the specified items contained in the
provision, the parties prescribed what would constitute full information
concerning the proposed transaction and by doing so, clearly limited the
purpose of giving written notice to information considered material to the
right holders= ability
to exercise the preferential right on the same terms and conditions as the bona
fide purchaser.








While is it
undisputed that OPL provided no information to Fasken concerning the basis for
the $63 million allocation of the purchase price attributable to the MFU, no
such information was required by Article 24.1 for purposes of providing written
notice of the proposed transaction. 
Therefore, the trial court did not err in failing to declare the notice
was invalid on this ground.

Alternatively,
Fasken entities argue that the trial court improperly instructed the jury that Afull information@
meant only the four enumerated items in Article 24.1 and this error probably
caused the rendition of an improper judgment. 
Fasken entities also argue that the jury should have been permitted to
consider whether full information was provided, in addition to the four
categories of information expressed in the Unit Operating Agreement.  The trial court has broad discretion in
submitting instructions to the jury and its determinations will not be
disturbed absent an abuse of discretion. 
See Trinity Indus., Inc. v. Ashland, Inc., 53 S.W.3d 852,
859 (Tex.App.--Austin 2001, pet. denied).

The following
questions were submitted to the jury: 
(1)(A) ADid
Occidental Permian Ltd., (formerly known as Altura Energy, Ltd.) fail to comply
with the notice provisions of Article 24.1?@;
and (1)(B) ADid
Occidental Permian, Ltd. fail to comply with Article 24.1 by providing $63
million as an allocation of that portion of the purchase price attributable to
Altura Energy, Ltd.=s
interest in the oil and gas estate under the Midland Farms Unit?@ 
Over Fasken entities=
objections, the jury was instructed that Awritten
notice@ under
Article 24.1 meant those items specifically listed in categories (1) - (4)
contained in Article 24.1 and no other. 
The jury answered ANo@ to both questions.








First, we observe
that the jury instruction does not instruct the jury that Afull information@
meant those items specifically listed in categories (1) - (4) contained in
Article 24.1, but rather the jury was instructed that Awritten
notice@ under
Article 24.1 meant those items specifically listed in the four enumerated
categories.  However, as discussed above,
Article 24.1 designated that, for purposes of providing written notice to the
other MFU interest owners, Afull
information@ meant
the items listed in categories (1) - (4). 
Fasken entities assert that the jury instruction did not permit the jury
to consider other information, in addition to the four categories of
information, in determining whether OPL complied with Article 24.1, and
therefore was error.  We conclude that
the trial court properly interpreted the Article 24.1 provision, which
expressed the parties=
intent to designate which items of information must be included in any written
notice of the triggering of the preferential right.  The trial court=s
instruction, therefore, was not erroneous because it tracked the contract
language regarding what Afull
information@ was to
be provided in the written notice.  See Lively Exploration Co. v. Valero
Transmission Co., 751 S.W.2d 649, 654-55 (Tex.App.--San Antonio 1988, writ
denied).

Even assuming arguendo
that the trial court erred in its instruction, Fasken entities have failed to
show that the error probably caused the rendition of an improper judgment.  To determine whether error in the charge is
reversible, we must consider the pleadings of the parties, the evidence
presented, and the charge in its entirety. 
Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass=n, 710 S.W.2d 551, 555 (Tex.
1986).  Error in the charge is reversible
if, in light of the entire record, it was reasonably calculated to and probably
did cause the rendition of the improper judgment.  Reinhart v. Young, 906 S.W.2d 471, 473
(Tex. 1995).








Fasken entities
argue that there was evidence in the record from which the jury could have
inferred the $63 million allocation was not the result of a good faith effort
to determine a reasonable allocation of the purchase price, but rather was an
attempt to inflate the price of the MFU to defeat Fasken entities= ability to exercise its preferential
purchase right.  First, we observe that
Fasken entities have not challenged the jury=s
failure to find that OPL did not comply with Article 24.1 by providing $63
million as the allocation of that portion of the purchase price attributable to
Altura=s
interest in the MFU.  Second, even if the
jury had considered the OPL=s
failure to provide the basis for the $63 million, there was undisputed evidence
that Fasken entities received the four enumerated categories of information in
OPL=s Article 24.1 written notice.  The notice requirement was merely incidental
to the preemptive right afforded to other interest owners in the MFU.  See Mecom v. Gallagher, 213 S.W.2d 304,
312 (Tex.Civ.App.--El Paso 1947, no writ). 
The notice given was sufficient to reasonably disclose the proposed
transaction and to provide Fasken entities an opportunity to exercise its
preferential right to purchase the MFU interest on the same terms and
conditions as the bona fide purchaser--even if there were technical
deficiencies that rendered that notice less than perfect.  See id. at 306-07, 310-11 (refusing to
indulge in pure technicalities where notice was sufficiently performed and
right holder was given opportunity to exercise his option, but declined to do
so).  Thus, in light of the entire
record, we cannot conclude that the trial court=s
instruction, if erroneous, probably caused the rendition of an improper
judgment.  Issue Three is overruled.








Fasken entities
contend in Issue Two that the trial court erred in failing to render judgment
that D.H. Acquisition was elected successor Unit Operator.  Specifically, Fasken entities assert that
Article 6.3, the successor selection provision in the Unit Operating Agreement,
is unambiguous and it should be construed as a matter of law that D.H.
Acquisition was elected successor operator under Article 6.3.  We first observe that it is undisputed that
the Fasken entities and OPL are all working interest owners in the MFU and
parties to the Unit Agreement and Unit Operating Agreement, which govern the
development and operation of the MFU.  It
is also undisputed that in June 2000, the Fasken entities and other
non-operator working interest owners, collectively having 25.32 percent of the
working interest, voted to remove OPL as the operator and then voted their
combined interests in favor of D.H. Acquisition as successor, while OPL voted
its 74.67 percent interest against the nomination.[17]

We apply the
well-settled principles of contract law discussed above in resolving Fasken
entities=
complaint.  Under the Operating
Agreement, selection of a successor Unit Operator is contingent on the
resignation or removal of the current Unit Operator.  Article 6.2 provides:

6.2 
Resignation or Removal. 
Unit Operator may resign at any time. 
Working Interest Owners may remove Unit Operator by the affirmative vote
of at least eight-five per cent (85%) of the voting interest remaining after
excluding the voting interest of Unit Operator. 
A Unit Operator who resigns or is removed shall not be released from its
obligations hereunder for a period of three (3) months after its resignation or
discharge unless a successor Unit Operator shall have taken over the operations
hereunder prior to the expiration of said period.

 

Thus, by its plain language Article
6.2 requires a super-majority vote of non-operating interest owners for the
removal vote to carry.  Article 6.2 does
not prohibit the current Unit Operator from voting, but its voting interest is
clearly excluded in tallying the affirmative vote for removal.  

The selection of a
successor Unit Operator in the event of a resignation or removal is governed by
Article 6.3.  Article 6.3 provides:

6.3 
Selection of Successor.  In
the event of the resignation or removal of a Unit Operator, a successor Unit
Operator shall be selected by the affirmative vote of three (3) or more Working
Interest Owners having at least eighty-five per cent (85%) of the combined
voting interest of all Working Interest Owners, provided no Unit Operator who
is removed may vote to succeed itself.

 








First, Fasken entities assert that
Article 6.3 requires that a successor Ashall
be selected@ thus, it
mandated the selection of a successor Unit Operator, in this case, D.H.
Acquisition, the party nominated. 
However, Article 6.3 clearly states that any succession must be based
upon the designated affirmative vote. 
Therefore, we find this argument has no merit.

Second, Fasken
entities argue that by voting against D.H. Acquisition=s
nomination as successor Unit Operator, OPL has in effect voted to succeed
itself, an action which is prohibited under Article 6.3.  We agree that the plain language of Article
6.3 prohibits the Unit Operator who is removed from voting for itself.  This, however, has not occurred.  The succession vote requires the affirmative
vote of three or more working interest owners who have at least 85 percent of
the combined voting interest of all working interest owners.  Article 6.3 in no way prohibits the removed
Unit Operator from casting its vote against the nominated successor.  Clearly, the parties=
intent was to ensure the super-majority of the working interest owners -- who
necessarily have a greater stake in the MFU=s
success -- would determine which of the working interest owners should be duly
elected as the successor Unit Operator. 
It so happens that since its inception, the Unit Operator of the MFU has
been the initial Unit Operator (Pan American Petroleum Company, followed by its
successors), which has over time maintained almost 75 percent of the combined
voting interest.  Despite having
maintained an influential voting position, we observe that OPL, standing alone,
nevertheless does not command a super-majority affirmative vote by virtue of
its majority voting interest.  Article
6.3 also requires an additional 10 percent of the voting interest, and in
addition, at least two minority working interest owners must also be in accord.








Third, Fasken
entities assert that the super-majority affirmative vote requirement only
applies in the event that the removed Unit Operator does not vote to succeed
itself.  Under their interpretation, the
phrase Aprovided
no unit Operator who is removed may vote to succeed itself@ is a condition precedent for Athe affirmative vote of three (3) or
more Working Interest Owners having at least eighty-five per cent (85%) of the
combined voting interest of all Working Interest Owners . . . .@ 
Even if we were to agree with the merits of this argument as we
discussed above, OPL did not vote to succeed itself, but rather asserted its
contractual right to vote against the working interest owner who was nominated
as successor.[18]









Finally, Fasken
entities argue that OPL is estopped from enforcing the successor Unit Operator
provisions and from asserting that D.H. Acquisition is not the duly elected
successor Unit Operator because despite the terms of the Unit Operator
Agreement, OPL voted Ano,@ did not nominate or take steps to
elect a successor, and has unilaterally insisted on a right to continue
operating the MFU.  In support of its
argument, Fasken entities cite to this Court=s
opinion in El Paso Nat=l
Bank v. Southwest Numismatic Investment Group, Ltd., 548 S.W.2d 942, 948
(Tex.Civ.App.--El Paso 1977, no writ), in which we discussed the doctrine of
quasi-estoppel.  As we stated in El
Paso Nat=l Bank,
unlike equitable estoppel, quasi estoppel requires no showing of false
representation or detrimental reliance.  Id.
at 947-48.  The principle of
quasi-estoppel precludes a party from asserting, to another=s disadvantage, a right inconsistent
with a position previously taken by him. 
Id. at 948.  The doctrine
applies when it would be unconscionable to allow a party to maintain a position
inconsistent with one in which it had acquiesced, or from which it had accepted
a benefit.  Steubner Realty 88, Ltd.
v. Cravens Road 99, Ltd., 817 S.W.2d 160, 164 (Tex.App.--Houston [14th Dist.]
1991, no writ).  Thus, the doctrine
forbids a party from accepting the benefits of a transaction and then
subsequently taking an inconsistent position to avoid corresponding obligations
or effects.  Mexico=s Indust., Inc. v. Banco Mexico Somex,
S.N.C., 858 S.W.2d 577, 581 n.7 (Tex.App.--El Paso 1993, writ denied). 

We understand
Fasken entities to be arguing that OPL -- by agreeing to Articles 6.2 and 6.3,
namely, that:  (1) the Unit Operator may
be removed by a vote of at least eighty-five percent of the voting interest
remaining after excluding the voting interest of the Unit Operator; (2) the
Working Interest Owners shall select a successor Unit Operator; and (3) no
removed Unit Operator may vote to succeed itself -- accepted the benefit of the
transaction or acquiesced to it. 
Further, Fasken entities argue that by voting Ano@ and refusing to participate in the
election of a successor Unit Operator, OPL has effectively voted to succeed
itself, which is a position inconsistent with the position OPL had previously
taken.








Fasken entities= attempt to establish quasi-estoppel
conclusively, however, fails for several reasons.  First, they have wholly failed to show that
the evidence conclusively establishes the elements of quasi-estoppel as a
matter of law.  Second, OPL=s decision to vote against the
nomination of D.H. Acquisition is not an act inconsistent with its previous
position, which presumably, Fasken entities is arguing was OPL=s decision to agree to the terms of
Articles 6.2 and 6.3.  We simply fail to
see how agreeing to the parties=
contract amounts to an inconsistent position with OPL=s
later assertion of its voting rights under that same contract such that the
super-majority affirmative vote provision should no longer apply.  Under Fasken entities=
analysis, quasi-estoppel would lie in any breach of contract claim.  This certainly cannot be the case since this
equitable doctrine applies only where it would be Aunconscionable@ to allow a party to maintain a
position inconsistent with one in which it had acquiesced, or from which it had
accepted a benefit.  Steubner Realty
19, Ltd., 817 S.W.2d at 164.  In sum,
we find Fasken entities=
quasi-estoppel argument to be without merit.

After reviewing
Fasken entities= numerous
contentions, we conclude the trial court did not err by failing to render
judgment that D.H. Acquisition was elected successor Unit Operator.  Issue Two is overruled.

The Fasken
entities contend in Issue One that they were entitled to judgment as a matter
of law for the amount of administrative overhead collected by OPL after it had
been removed as Unit Operator on June 16, 2000. 
Fasken entities claim that the trial court erred because OPL failed to
prove its entitlement to those administrative overhead charges either under
contract, quantum meruit, or unjust enrichment. 
They also assert that at all times it was OPL=s
burden to establish a contractual entitlement to collect the administrative
overhead Fasken entities paid to OPL, which they argue OPL failed to do.  To the contrary, Fasken entities maintain
that they conclusively negated the existence of any contractual relationship
with respect to the operation of the MFU by establishing OPL had been removed
as Unit Operator on June 16, 2000.  








We must disagree
with Fasken entities=
contention that OPL had the initial burden to plead and to prove it had the
right to retain administrative overhead charges.  Pointing to cases involving actions for
declaratory judgment, Fasken entities assert that the trial court was to ignore
the formal position of the parties and place the burden of proof on the party
asserting the affirmative of the controlling issues--which in this case, was on
OPL to establish it was operating the MFU under a valid and enforceable
contract.  See e.g., Ross v.
American Radiator & Standard Sanitary Corp., 507 S.W.2d 806, 809-10
(Tex.Civ.App.--Dallas 1974, writ ref=d
n.r.e.).  The present case, however, is
distinguishable by reason that the Fasken entities did not bring suit to
establish their non-liability for administrative overhead charges due, but not
paid.  Rather, they sought to recover any
damages that were a result of OPL continuing to operate the MFU in breach of
the parties=
contract, which could have included recouping administrative overhead charges
they had paid.  The burden of proof,
therefore, was on Fasken entities to plead and prove its breach of contract
claims.








We also note that
Fasken entities did not specifically plead nor request submission of a specific
question in support of any claim for recovery of the administrative overhead
they paid to OPL.  At trial, Fasken
entities elicited testimony from Mr. Merritt concerning the overhead costs that
the Fasken entities had paid to OPL through their joint interest billings from
July 2000 to December 2002.  Mr. Merritt
stated that he believed Fasken was seeking to recover these overhead costs in
this litigation.  OPL objected to this
line of  testimony, arguing that the
overhead issue was not supported by the pleadings and refusing to try the issue
by implied consent.  In response, Fasken
entities argued that their general prayer for relief supported their attempt to
recover the overhead they paid after OPL was removed as the operator.[19]  The trial court allowed testimony on the
overhead issue after finding that Fasken entities had pled they were damaged to
some degree by OPL=s alleged
improper operation of the MFU.  Without
waiving its objection, OPL requested and was granted leave to file a trial
amendment to its pleadings to include defenses of waiver, unjust enrichment,
quantum meruit, and estoppel.

While OPL did
amend its answer to include certain defenses that could have barred Fasken
entities= recovery
of administrative overheard charges, but failed to request jury questions on
these defense issues, this is of little import unless Fasken entities had
proven that by continuing to operate the MFU after June 16, 2000, OPL was in
breach of the Unit Operating Agreement and that they suffered damages resulting
from that breach.  However, we need not
entertain the issue of whether Fasken entities conclusively established as a
matter of law that OPL breached the Unit Operating Agreement by collecting the
administrative overhead because they have not challenged the jury=s failure to find that they were
damaged by OPL continuing to act as Operator under the Unit Operating Agreement
after June 16, 2000.[20]  See Abraxas Petroleum Corp. v. Hornburg,
20 S.W.3d 741, 758 (Tex.App.‑-El Paso 2000, no pet.)(elements of a breach
of contract claim are the existence of a valid contract; performance or
tendered performance by the plaintiff; breach of the contract by the defendant;
and damages to the plaintiff resulting from that breach).  Therefore, we conclude the trial court did
not err in refusing to award Fasken entities the administrative overhead
collected by OPL after OPL was removed as Unit Operator.  Issue One is overruled.








In Issue Four,
Fasken entities contend that the trial court erred by taxing items as costs
that are not permitted by any rule or statute. 
Specifically, they challenge the awarding of costs in the amount of
$27,232.76 for deposition-related expenses for services other than Aoriginal stenographic transcripts.@ 
The assessment of costs will be reversed on appeal only if the trial
court abused its discretion.  Crescendo
Investments, Inc. v. Brice, 61 S.W.3d 465, 480 (Tex.App.--San Antonio 2001,
pet. denied); Allen v. Crabtree, 936 S.W.2d 6, 7-8 (Tex.App.--Texarkana
1996, no writ).

Rule 131 provides
that A[t]he
successful party to a suit shall recover of his adversary all costs incurred
therein, except where otherwise provided.@  Tex.R.Civ.P.
131.  Section 31.007(b) of the Texas
Civil Practice and Remedies Code states that a judge of any court may include
in any order or  judgment all costs,
including Afees of
the court reporter for the original of stenographic transcripts necessarily
obtained for use in the suit@and
Asuch other costs and fees as may be
permitted by these rules and state statutes.@  See Tex.Civ.Prac.&Rem.Code
Ann. ' 31.007(b)(2)
& (4)(Vernon 1997).  Texas courts
have also allowed recovery of items such as deposition costs and filing, court
report, transcript, and subpoena/citation fees. 
See Brice, 61 S.W.3d at 480; Allen, 936 S.W.2d at 8; Wallace
v. Briggs, 162 Tex. 485, 348 S.W.2d 523, 527 (1961).  Texas Rule of Civil Procedure 140, however,
specifically prohibits copies of paper not required by law or the rules from
being taxed in the bill of costs.  See
Tex.R.Civ.P. 140.

After the trial
court entered the final judgment against Fasken entities, a bill of costs was
issued which taxed to Fasken entities the total deposition cost for all
defendants in the amount of $9,199.19. 
Upon the defendant=s
motion to retax costs, the trial court later awarded deposition costs of $17,551.90
to OPC and $18,930.05 to OPL.  Thus, the
total deposition costs taxed to Fasken entities was $36,481.95.








In their brief,
Fasken entities assert that the extra deposition-related expenses in the amount
of $27,232.76 included charges for Avideo
depositions, electronic versions of transcripts, condensed print versions of
transcripts, photocopies, and extra copies of deposition transcripts,@ as reported in the defendants= verified statements of costs.  However, they fail to direct our attention to
specific items in the defendants=
verified statements of costs which they assert constitute the $27,232.76 they
claim was improperly taxed.  Under Rule
38.1(h) of the Texas Rules of Appellate Procedure, an appellant=s brief must contain a clear, concise
argument for the contentions made, including appropriate citations to
authorities and to the record.  Tex.R.App.P. 38.1(h).  After reviewing the record, we cannot
determine which itemized costs in defendants=
verified statements of costs constitute the $27,232.76 that was purportedly
improperly taxed.

Further, we
observe that the defendants=
verified statements of costs are supported by affidavits which state that the
referenced depositions and transcripts were Anecessarily
obtained for use in the suit and were used to question witnesses and prepare
for argument at trial.  As the Brice Court
noted, A[t]ranscripts
>necessarily obtained for use in the
suit= seems to
obviously include depositions and trial testimony used to question witnesses
and prepare for argument at trial.@  Brice, 61 S.W.3d at 480-81.  Costs which are necessary to the conduct of
trial may be recoverable.  Operation
Rescue-Nat=l v.
Planned Parenthood of Houston & Southeast Tex., Inc., 937 S.W.2d 60, 88
(Tex.App.--Houston [14th Dist.] 1996), aff=d
as modified on other grounds, 975 S.W.2d 546 (Tex. 1998).  Accordingly, we cannot conclude the trial
court abused its discretion in its assessment of costs.  Issue Four is overruled.

We affirm the trial
court=s
judgment.

 

June
30, 2005

DAVID WELLINGTON
CHEW, Justice

 

Before Barajas, C.J., McClure, and Chew, JJ.











[1]
See Tex.Gov=t Code Ann. '
22.201(i)&(l)(Vernon 2004); see also Acts of 2003, 78th Leg., R.S.,
ch. 315, ' 4, 2003 Tex.Gen.Laws 1337; Acts of 2003, 78th
Leg., R.S., ch. 662, '
1, 2003 Tex.Gen.Laws 2081.





[2]
OPL and OXY USA, Inc. are both subsidiaries of OPC.  





[3]
Fasken entities withdrew their claims for negligent misrepresentation, fraud,
and civil conspiracy before the case was submitted to the jury.  The trial court granted a directed verdict
against Fasken entities on all the remaining claims against OPC and OXY USA,
Inc., including their tortious interference claim.





[4]
Prior to the trial proceedings, the trial court granted part of Fasken entities= motion for partial summary judgment,
finding that OPL was removed as the Unit Operator as of June 16, 2000.





[5]
Lon Buehner, an AMOCO executive in its acquisition and divestments group,
explained that the company had considered breaking up the assets into smaller
packages, but given their time frame for the sale, they ultimately decided to
sell the entire entity as one package and considered it a unique opportunity
for a party to make a major acquisition as a strong strategic move into a new
core area of oil production.  The company
considered half a dozen bids, selected Netherland Sewell and Associates as the
third-party engineering firm to value the properties, and provided bidders a
significant amount of information that had previously been developed within
Altura as well as extensive access to Altura staff.





[6]
Steven Chazen, chief financial officer for OPC, testified that Netherland
Sewell and Associates is a well-known and reputable firm and one of the top
three firms in the country that prepares these reserve reports.  Mr. Chazen also testified that in the
confidentiality agreement OPC executed as a bidder AMOCO and Shell disclaimed
the Netherland Sewell report as a summary report, which it should not rely on
necessarily.  He explained that in the
oil business, buyers are suppose to conduct their own evaluation and assume the
risk in reserve production.





[7]
Mr. Grubb testified that in his opinion, the Altura assets, a combination of AMOCO
and Shell properties, were some of the highest quality reservoirs that existed
in the Permian basin and by forming Altura, they had created the number one
producer of oil in the Permian basin. 
Mr. Grubb believed the Netherland Sewell report numbers for
probable reserves indicated that the projects that Altura would have ultimately
done were technically and economically viable. 
In his MFU tabulation, he placed zero present value in the possible
reserves category for the MFU because he was trying to be conservative.  He believed that $52 million was the very
lowest, most conservative valuation one could put on the MFU, noting that a $52
million figure would give no value to the possible reserves category and was an
absurdly low value for probable reserves.





[8]
Article 3.2 (b) of the Purchase and Sale Agreement provides: 

 

The Parties acknowledge that the sale of the
Interests pursuant to this Agreement may trigger a preferential purchase right
to that certain oil and gas estate (the >Estate=) covered by that certain Unit
Operating Agreement (as amended, the >Unit
Operating Agreement=), in
favor of Fasken Land and Minerals, Ltd. and certain other Persons (the >Pref Rights Holders=) covering the Midland Farms Unit.
Sellers will cause the LP [Altura] to comply with the preferential purchase
right procedures required by the Unit Operating Agreement; and the Parties
agree that the allocation of that portion of the Purchase Price attributable to
the Pref Rights Holders=
interest in the Estate is Sixty‑Three Million Dollars ($63,000,000).





[9]
Altura held a 74.67 percent working interest in the MFU, which OPC or a
subsidiary would acquire in the proposed sale.





[10]
Mr. Dickman testified that Mr. Merritt reported to him that he thought the top
value range for the MFU was 42 to 43 million dollars.  Based on Mr. Merritt=s
recommendation from the information they had at that time, Mr. Dickman stated
that this was the most he would have paid for the MFU.  Ronald Harrell, a consulting petroleum
engineer employed by Ryder Scott Company, testified that his company estimated
that the fair market value of the Altura working interest in the MFU, as of
January 1, 2000, was $34,500,000. 
However, without having had the opportunity to evaluate each of the
properties that comprised the total asset purchase, Mr. Harrell was unable to
do an allocation of the purchase price for the MFU with respect to the total
transaction.





[11]
On April 19, 2000, OPC closed on its purchase of the partnership interests in
Altura and changed the partnership=s
name to OPL.





[12]
Mr. Oenbring testified that he believed that Fasken entities were given all the
information they were entitled to and that in his experience with preferential
rights provisions, the parties do not share engineering information because the
working interest owners Ahave
the intimate knowledge of the property already@
as well as a history of the property=s
production information.





[13]
Mr. Oenbring testified that he responded to Mr. Dickman=s
letter on June 1.  In his response, Mr.
Oenbring represented to Fasken entities that OPL would consider amending the
preferential right provision in the event of any subsequent sale or assignment
of its assets to 

non-Oxy affiliates and also
indicated that OPL would provide the MFU portion of the Netherland Sewell
report subject to a satisfactory confidentiality agreement.  On June 2, Mr. Dickman replied, noting OPL=s rejection of their proposal and
requesting the entire Netherland Sewell engineering report.





[14]
It is undisputed that the vote to remove OPL as the operator passed pursuant to
Article 6.2 of the Unit Operating Agreement, which provides that the Unit
Operator may be removed Aby
the affirmative vote of at least eighty-five per cent (85%) of the voting
interest remaining after excluding the voting interest of [the] Unit Operator.@





[15]
Interestingly, Ms. Kvasknicka had sent an e-mail to Mr. Merritt on April 17,
2000, in reference to the meeting to remove the operator, indicating that she
had spoken to Altura and was told AOxy
doesn=t believe
that Fasken can discharge Altura as the operator@
and that AOxy
believes this will end up in court because the agreement doesn=t have a clear mechanism to name the
successor and that the vote will end in a stalemate.@





[16]
Mr. Oenbring testified that under OPL=s
operation, the MFU has improved production and the Fasken entities have
received about $25 million in net profits through their royalty interest and
working interest in the MFU.





[17]
OPL concedes that it was Aremoved@ as Unit Operator by the affirmative
vote of the non-operator working interest owners in the MFU.  However, OPL maintains the position that its
authority to act as the Unit Operator under the terms of the Operating
Agreement must continue until it is Areplaced@ by a duly elected successor pursuant
to Article 6.3.





[18]
Fasken entities assert in their brief that AOPL
continues to vote >no= in any successor Unit Operator
elections@ and by
its action has eviscerated the parties=
removal provision.  They have provided no
citation to the record of evidence of other Ano@ votes by OPL nor have we found such
evidence in our review of the record.





[19]
In Fasken entities= fifth
amended petition, they alleged that APlaintiffs
are entitled to recover from OPL all damages to which Plaintiffs are entitled
at law or in equity due to Altura=s
and OPL=s breaches
of contract, including (but not by way of limitation) Plaintiffs= expenses and attorneys= fees incurred with respect to this
case.@





[20]
In Question No. 3, the jury was asked, AWere
Plaintiffs damaged by Occidental Permian, Ltd. continuing to act as Operator
under the Unit Operating Agreement for the Midland Farms Unit after June 16,
2000?@  The jury was instructed that AOccidental Permian, Ltd. was removed as
Operator under the Unit Operating Agreement for the Midland Farms Unit on
June 16, 2000, and no successor Operator was elected.@ 
The jury answered, ANo@ to Question No. 3.